CHARLES A. HAMLIN, as Administrator of the Estate of LYMAN STEVENS, Deceased, Respondent, *v.* JULIA E. STEVENS et al., Respondents, and LYMAN A. STEVENS, Appellant.

1. WILL — WHEN WORDS "OUR CHILDREN" DO NOT INCLUDE AN ALLEGED ADOPTED CHILD. A will which describes a legatee as testator's "nephew," refers to his own children as his "oldest daughter" and his "second daughter," and directs that after the decease of his wife the residuary estate be divided equally between "our children or their heirs," does not include such legatee as a child entitled to share in the residuary estate, notwithstanding the fact that from the time he was eleven years old he was treated as an adopted child, although never formally adopted.

2. AGREEMENTS BY DECEDENTS IN THEIR LIFETIMES AS TO THE DISTRIBUTION OF THEIR ESTATES — THEIR DANGEROUS CHARACTER — UNLESS THEY ARE CLEARLY ESTABLISHED BY SATISFACTORY PROOF AND ARE EQUITABLE, SPECIFIC PERFORMANCE WILL NOT BE DECREED. Contracts claimed to have been entered into with persons, to be enforced after their deaths, to the detriment of those who would otherwise be entitled to their estates, have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents; they threaten the security of estates and throw doubt upon the power of a man to do what he wills with his own. The savings of a lifetime may be taken away

from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation, with all the dangers which, as experience shows, surround such evidence. The truth may be in them, but it is against sound policy to accept their statements as true, under the circumstances and with the results pointed out. Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses. Unless they· are established clearly by satisfactory proofs and are equitable, specific performance should not be decreed. ·The Court of Appeals desires to be emphatic upon the subject, for it is impressed with the danger, and aims to protect the community from the spoliation of dead men's estates by proof of such contracts through parol evidence given by interested witnesses.

3. INSUFFICIENCY OF EVIDENCE TO ESTABLISH SUCH AN AGREEMENT. The evidence upon the trial of an action for the construction of a will examined and held insufficient to establish an alleged contract by which a testator agreed to give to an alleged adopted child a share·of his property at his decease.

*Hamlin* v. *Stevens*, 78 App. Div. 629, affirmed.

(Argued November 16, 1903; decided December 18, 1903.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered December 15, 1902, affirming a judgment of Special Term construing the will of Lyman Stevens, deceased.

The facts, so far as material, are stated in the opinion.

*Theodore E. Hancock* and *Thomas K. Smith* for appellant. The court erred in holding that there was no contract made by the testator with the defendant's parents whereby and wherein he agreed to give to the defendant any share of his property at his decease, and that there is no clear and convincing evidence establishing such a contract, and that he did not enter into an agreement with the parents of Lyman A. Stevens whereby he agreed or intended to make the defendant Lyman A. Stevens one of his residuary beneficiaries or give him any share or proportion of his estate. (*Newton* v. *Pope*, 1 Cow. 109; *Conrad* v. *Williams*, 6 Hill, 444; *Lomer* v. *Meeker*, 25 N. Y. 361; *Elwood* v. *W. U. T. Co.*, 45 N. Y. 549; *S. Nat. Bank* v. *Weston*, 172 N. Y. 250.) The agreement was mutual and founded upon an adequate consideration,

which has been fully performed by Lyman A. Stevens; the agreement was definite and certain and inured to the benefit of said defendant. It appears clearly that the boy was surrendered absolutely to the custody, control and care of the decedent, free from any interference upon the part of his parents. (*Healy* v. *Healy*, 31 Misc. Rep. 636; 55 App. Div. 315; *Gates* v. *Gates*, 34 App. Div. 612; *Schutt* v. *Missionary Society*, 41 N. J. Eq. 115; *Godine* v. *Kidd*, 64 Hun, 585; *Todd* v. *Webber*, 95 N. Y. 181; *Rhodes* v. *Rhodes*, 3 Sandf. Ch. 305; *Heath* v. *Heath*, 18 Misc. Rep. 521; *Brantingham* v. *Huff*, 43 App. Div. 414, 417.)

*Homer Weston* and *Waldo Weston* for respondent. By apt words the testator described the objects of his bounty and their relationship to him, and placed them in distinct classes, and the word " our," used in the clause making provision for the wife, naturally referred to himself and wife, and when applied to " children " excludes the possibility that he intended to place his nephew in that class. (*Smith* v. *Allen*, 87 N. Y. S. R. 114; 32 App. Div. 374; affd., 161 N. Y. 478; *Matter of Thorn*, 155 N. Y. 141.) The proof failed to establish appellant's claim by contract to share equally with testator's children. (*Gall* v. *Gall*, 46 N. Y. S. R. 806; *Wilson* v. *Heath*, 87 N. Y. S. R. 166; *Edson* v. *Parsons*, 155 N. Y. 555; *Smith* v. *Allen*, 32 App. Div. 114; 161 N. Y. 483; *Mahoney* v. *Carr*, 175 N. Y. 454; *Conlon* v. *Mission*, 87 App. Div. 507; *Gates* v. *Gates*, 34 App. Div. 608; *Hayden* v. *Hayden*, 8 App. Div. 547; *Drake* v. *Seaman*, 97 N. Y. 230; *Bonesteel* v. *Van Etten*, 20 Hun, 470; *Hunt* v. *Hunt*, 171 N. Y. 396.)

VANN, J. This action was brought for the construction of the will of Lyman Stevens, deceased, with reference to certain questions not material on this appeal. The appellant was not made a party in the first instance, but he was permitted to come in as a defendant and to raise two issues: 1. That according to the terms of the will, when considered in the

light of surrounding circumstances, he was one of the residuary
legatees; 2. That he was entitled to one-third of the residuary
estate by virtue of a contract alleged to have been made in his
interest between his father and the testator when he was an
infant. The Special Term found against him upon both issues
and the judgment entered accordingly was affirmed by the
Appellate Division, one of the justices dissenting. From the
judgment of affirmance Lyman A. Stevens appealed to this
court.

The will was drawn by the testator himself but two days
before his death. He first bequeathed to Lyman A. Stevens,
whom he described as his "nephew," the sum of $6,000, and
by the next clause he devised to his "oldest daughter Mary
L. Hamlin" a house and lot, in confirmation of a former
informal gift, and gave her a legacy of $2,000. He then
devised to his "second daughter Grace S. Loomis," also in
confirmation of a former informal gift, a house and lot, and
bequeathed her $2,000 in money. His fourth gift of $1,000
for the benefit of a religious organization was followed by the
residuary clause, whereby he instructed his executors "to
administer, execute and keep employed all that remains of my
estate for the use, benefit and comfort of my beloved wife
Julia E. Stevens during her natural life   *   *   *   and at
the decease of my wife the residue remaining of my estate
shall be divided equally between *our children* or their heirs."

The first claim of the appellant is founded upon the words
"our children" as used in the residuary clause. The only
natural children of the testator were the two daughters
named in the will, but the appellant contends that it was the
intention of his uncle, in using the words "our children," to
include him as one of his residuary legatees, because from the
time he was eleven years old he was treated as an adopted
child, although never formally adopted. The trial court
found that the testater clearly distinguished in his will,
"Lyman A. Stevens, as a nephew, and his daughters, as his
children, and the words 'our children' as used in the residuary
clause in the will were not intended to and do not include the

defendant, Lyman A. Stevens, and he is not entitled to share in the residuary estate of the decedent as a child under said terms."

We think this conclusion was right, for the testator described the appellant as his nephew, not as his son. He referred to his own children as his "oldest daughter" and his "second daughter" and finally in the same sentence in which he made provision for his wife he directed that upon her decease the remainder of the estate should be divided equally between their children. Although there was evidence tending to show that the testator treated the appellant as his son and often spoke of him as his son, still his description of him as his nephew shows that he did not intend to include him by the use of the word "our" as one of his children. That word referred to himself and wife, and it was natural to use it in referring to their children, especially as it occurs right after the thoughtful provision made for his wife and in connection with his tender allusion to her. As this point was not pressed upon the argument it needs no further discussion.

The main reliance of the appellant is upon the alleged contract. The trial judge found that the testator "never made a contract with the defendant, Lyman A. Stevens, or with his parents whereby and wherein he agreed to give to the said Lyman A. Stevens any share of his property at his decease and that there is no clear and convincing evidence establishing such a contract." As this finding was based on conflicting evidence, we are not asked to review it, but we are asked to set it aside and grant a new trial, because incompetent evidence was received by the trial court, although duly objected to by the appellant. In order to decide the points raised it becomes necessary to state the leading facts.

The testator died on the 16th of October, 1891, leaving a widow, said two daughters and an estate valued at $65,000. The appellant is the son of Leonard Stevens, a brother of the testator, and his wife, Sarah, who lived in Huron county, Ohio. He resided with his parents until April, 1869, when, at the age of eleven years, he came to Syracuse and lived

with his uncle, the testator. "From that time onward," as the trial justice said in his opinion, "he formed a part of the family of Lyman Stevens and seems to have been treated with all the regard and affection of a son. He was reared, educated and clothed by his uncle, and on his part seems to have repaid the latter for his care by affection and gratitude and by services similar to those which a child would have rendered to a father. He helped his uncle about his farms and about his business, and the uncle often referred to him as his right-hand man and as his son. On several occasions he stated that he knew no difference between Lyman and his other children and that he should make no difference between him and them when he came to divide his estate." When he was nineteen or twenty years old the testator paid him wages at the rate of ten dollars a month, and after he became of age fifteen dollars a month, and charged him with all sums paid to him or for his benefit. His board was without charge. Leonard Stevens, his father, died a good many years ago, but his mother, who was seventy-seven years old when her deposition was taken before the trial, testified that in the fall of 1868 the testator, while on a visit to his brother in Ohio, "asked if we were willing that Lyman, his namesake, should come to live with him as his own son. He said that if we would allow him to come and live with him until he was twenty-one, he would educate him and he should share in whatever earthly wealth he had at his death. The subject was then dropped. In January, next year, 1869, brother Lyman came to visit us again. * * * My husband suggested that in such a matter we should have some legal papers. My brother-in-law stated that he could not see the necessity of any such a thing, that he considered his word just as binding as any papers that could be drawn up. He said, 'You need have no misgivings. I shall always regard him as my own son and always treat him as such.' He said that whatever wordly wealth that he should have to dispose of at the time of his death they should share and share alike, his two daughters and Lyman."

She further testified that between January and April, 1869, two letters came from the testator, which, after due search, could not be found. When asked if she could give the contents of those letters she answered, "Not exactly." When asked if she could give the substance of the letters, she answered, "No." The examination then continued: "Q. You may give the substance, if you can, of those letters. A. They told how pleased his wife and family were that Lyman was coming. Q. Did he state anything as to how he would dispose of his goods? A. He should have anything that money would buy, his education, etc. I do not think he said anything in those letters as to how he should dispose of his earthly goods. Q. What were you going to say? A. He repeated in those letters that he should be treated as his own son and whatever he had should be equally divided between him and his two daughters. His words were that they should share and share alike."

The appellant testified that when he was twenty or twenty-one years of age his father showed these letters to him and he remembered that each contained the statement "that if I was allowed to come and live with my uncle until I was twenty-one years old I should share equally with Mary and Grace in whatever property he had to dispose of at the time of his death." He could not state anything else that the letters contained, except that they were signed by his uncle and addressed to his father and possibly to his mother.

Three letters from the testator to Mr. and Mrs. Leonard Stevens were read in evidence, one without date and the others dated respectively April 8th and 27th, 1869. The one without date was apparently written at about the same time as the others. They all referred to the appellant, spoke of him with affection, and in one of them the testator wrote: "If he (meaning the appellant) could stay with us nothing would be spared on the part of any of us to do the very best we could for him. We have furnished a room in the best manner for him, where he sleeps alone, and it breaks our hearts to think he will not stay.  *  *  *  I am 'Son less,' and we

want my little namesake, and if you have not repented let-
ting him come and are of the same mind still, you must write
in a very decided manner that he must stay and then I can
manage it. If you do regret sending him I will yield up all
my wishes and plans and send him home. But I think it
would be decidedly bad for him. * * * If you say stay,
he will feel desperately for a time, but will soon be over it,
and I am persuaded he will grow up a blessing to, and pride
of us all, for we should never distinguish between him and
my own children." In another he said : "I am afraid I shall
be too indulgent; I now regard him as my boy and I can't
see but all love him just as well as we do Gracie, for Julia
loves him just as well as I do and is afraid the relation will
have to be sundered. * * * No doubt he has his home-
sick spells as any good boy must in having all his life associa-
tions broken up. But this will wear away and, my word for it,
he will be greatly benefited for it in the end, for he shall have
all that love, money and care can do for him." In the third
he wrote : "It would be strange, indeed, if he could give up
the idea of going home without a struggle in his mind. He
is a good and beautiful boy and has got into my heart so I
cannot give him up."

These letters were written after the boy had become home-
sick, for the purpose of persuading his father to be firm with
him and to tell him he must remain with his uncle. Although
they set forth the advantages that Lyman would have if he
remained, such as a good home, education, loving care and the
like, no allusion was made to any contract of the testator to
give him a part of his estate. This was a singular omission if
such a contract had, in fact, been made, for the prospect of a
large inheritance would naturally have had great persuasive
force with a farmer of somewhat limited means and a number
of children.

A letter from Leonard Stevens, the father of the appellant,
to the testator, dated February 21st, 1869, was read in evi-
dence by the plaintiff. It was written in answer to a letter
dated the 16th of February, but not produced, and the material

part is as follows: " You said in your letter that you and Julia had considered the matter over and that you would like to have Lyman come and live with you and grow up side by side with your Gracie; Sarah and myself have considered the matter over and have come to the conclusion to let him go and live with you. Dear brother, you know it is a struggle for a parent to give up their loved ones when so young. But I have all confidence in you and Julia that you will look to his interest and welfare. I shall expect you to be parent and guardian. Lyman is young and it is a great responsibility to take one so young and rear to manhood. But he is a fine boy and by good training I think he will be an honor to his parents in their declining years." Evidence was also given tending to show that the testator repeatedly said he knew no difference between the appellant and his other children and that on several occasions he declared he should make no difference between him and them when he came to divide his estate. No further evidence was given tending to establish the alleged contract.

After probate of the will the amount due the appellant for unpaid wages according to the books of the testator was paid him and he gave a receipt " in full for all demands of every kind and nature against the estate of Lyman Stevens, deceased, except the legacy as stated in the will." He accepted the bequest of $6,000 without objection and without notice of any claim by virtue of the contract. About nine years after the probate of the will this action was commenced to obtain a construction thereof with reference to subjects not now material. In the meantime the executors had advertised for claims, but none was presented by the appellant, who does not appear to have given any notice of the existence of a contract until after this action was commenced.

Contracts of the character in question have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated

and hard to disprove, because the sole contracting party on one side is always dead when the question arises. They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents.

In *Shakespeare* v. *Markham* (72 N. Y. 400, 403) this court declared that " contracts claimed to have been entered into with aged or infirm persons, to be enforced after death to the detriment and the disinheriting of lawful heirs, who otherwise would be entitled to their estates, are properly regarded with grave suspicion by courts of justice, and should be closely scrutinized and only allowed to stand when established by the strongest evidence." While such contracts are sometimes enforced by the courts, it is only when they have been established by evidence so strong and clear as to leave no doubt, and when the result of enforcing them would not be inequitable or unjust. Thus in a recent case the agreement was in writing, there were no children to be disinherited, and no will to show the understanding of the decedent. ( *Winne* v. *Winne*, 166 N. Y. 263.) In deciding that case we said : " In cases of this character, where it appears for any reason that the enforcement of an agreement would be unfair, inequitable or unjust, the remedy should be denied. Each case must be governed by its own facts and circumstances, and unless the proof discloses a situation where good conscience and natural justice require the enforcement of the agreement, this relief should not be awarded. * * * While we are of the opinion that specific performance of this contract was properly awarded, this decision is based solely upon the findings of the trial court and the particular facts and circumstances of this case. Yet it must not be regarded as an authority for maintaining such an action under different circumstances or upon other proof, as the granting or denial of such relief always rests in the sound discretion of the court, and should be denied unless the agreement is fair and just and its enforcement equitable."

In a later case we were fettered by the iron rule of unanimous affirmance which prevented us from looking into the

evidence, and, following the *Winne* case, we affirmed the judgment. (*Healy* v. *Healy*, 166 N. Y. 624.) In *Brantingham* v. *Huff* (174 N. Y. 53) the parol contract was rejected, because at the time or after it was made a written indenture of adoption had been entered into. In *Mahaney* v. *Carr* (175 N. Y. 454) we refused to enforce by specific performance a parol contract between the grandfather and the father of an infant, whereby the latter surrendered his rights to the child and the former adopted her as his daughter and agreed that upon his death she should have one-fourth interest in all the property he should thereafter acquire. Before his death the grandfather had given a part or the whole of his property to his wife. Commenting upon the nature of the contract in that case, Judge O'BRIEN said: "It certainly is not a testamentary disposition since they must be in writing, executed with all the statutory formalities. It is not a conveyance or transfer *in præsenti* of any property whatever. If it had the effect attributed to it by the judgment, it is more potential and effective than any testamentary disposition could be since such dispositions are always ambulatory and subject to revocation. It is not an executory contract for the future conveyance or transfer of any specific property. It could not take effect until the death of the grandfather, and during his life he was not in default with respect to it, and yet this anomalous arrangement was, according to the judgment in this case, effective enough for the latter to nullify the gifts and conveyances made by the grandfather in his lifetime to his wife and the provisions of his will that took effect upon his death. The deceased left three children of his own that certainly had as strong a natural claim upon his bounty as the plaintiff, his grandchild, but no one, I think, would claim that had the deceased made the same promise to them that it is found he made to the plaintiff, it would constitute a basis for an action of specific performance against the widow. An adopted grandchild must, therefore, have acquired in some way a greater right in the grandfather's estate than his own children, since in a verbal interview between her

4

father and grandfather when she was five years old she acquired one-fourth of all his property. * * * If this was a contract it certainly was not a mutual one, binding the child or her father as well as the grandfather. The father and the child could at any time repudiate it and the grandfather had no remedy. * * * Whatever the transaction in the finding in this case may be called, or however conclusive, it would seem to be clear that it does not possess all or any part of the qualities required in order to sustain the judgment."

We are of the opinion that no view of the evidence in the case before us would warrant the conclusion that the alleged contract was made. Assuming that the trial judge believed that the appellant and his mother intended to tell the truth, still, owing to their deep interest, it would be unsafe to base a finding on their testimony when it may be followed by such grave·consequences. Such contracts are dangerous. They threaten the security of estates and throw doubt upon the power of a man to do what he wills with his own. The savings of a lifetime may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation, with all the dangers which, as experience shows, surround such evidence. The truth may be in them, but it is against sound policy to accept their statements as true, under the circumstances and with the results pointed out. Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses. Unless they are established clearly by satisfactory proofs and are equitable, specific performance should not be decreed. We wish to be emphatic upon the subject, for we are impressed with the danger, and aim to protect the community from the spoliation of dead men's estates by proof of such contracts through parol evidence given by interested witnesses.

During the trial of this action certain evidence was received under the objection and exception of the appellant, which we regard as incompetent; but, in view of what has been said, it

is obvious that it could not have affected the result.  No competent evidence was excluded, and if all the testimony in favor of the respondents. were rejected, still the evidence in favor of the appellant would not have justified the trial court in finding that the alleged contract was made.   The error, therefore, was harmless and the judgment should be affirmed, with costs.

PARKER, Ch. J., GRAY, BARTLETT, HAIGHT, CULLEN and WERNER, JJ., concur.

Judgment affirmed.