In the Matter of the Estate of JACOB KEMPF, Deceased.

Surrogate's Court, Oneida County, January 7, 1931.

*Thomas J. McNamara,* for the administratrix.

*James T. Cross,* for Madeline Kempf, claimant.

EVANS, S. The claimant asserts in substance that about the month of November, 1926, she and the decedent entered into an agreement whereby he promised that if the claimant remained unmarried and lived with him and kept house for him until his death, the claimant was to then have the house and lot where the decedent lived at No. 705 South James street, Rome, N. Y., together with the household furniture and that he would make a will and so provide; that the claimant did not marry and kept house for her father until his death, and that he left no will and did not otherwise transfer to the claimant the property in question.

She claims the real property and the furniture or the proceeds derived from a sale.

The value of the house is stipulated at $3,500, and the value of the furniture at $300.

The decedent also left something over $9,000 on deposit in banks. He died intestate in the city of Rome, N. Y., on January 10, 1930. He was born in Germany and came to Rome over forty years ago. His wife died in 1908, leaving seven daughters, whose ages then ranged from Winifred, the youngest, an infant under one year, to Rose, the oldest, who was twenty-four years of age. Their father never remarried but maintained a home for himself and the girls who did the housework.

In the course of time all of the daughters, excepting Winifred, the youngest, married. All, excepting two, who live in the west, established homes in or near the city of Rome. The evidence creates the impression that this family was raised in a clean and wholesome atmosphere of industry and thrift.

The daughters appear to have been friendly among themselves and devoted to their father up to the time of his death.

Madeline (the claimant) was married in the year 1918. Her marriage proved to be unfortunate, and within a year she returned to her father's home with an infant son where they have since

lived. In 1924 she obtained in this State a decree of divorce from her husband. Madeline cared for her small son and performed the usual household tasks. Occasionally some of her married sisters dropped in and assisted in the work. Winifred was a young girl still at home who attended school. In conjunction with the work at home, Madeline ran a gas station and later for several years she worked in a local knitting mill. According to the evidence of neighbors she was industrious and competent.

The decedent was an active man and for many years was employed in local industries. For some time preceding his death he worked for the city. He was sixty-nine years of age when he passed away and was ill about one week.

In the autumn of 1926 a young man named Gottlieb Regetz, who was a local taxi driver, became acquainted with Madeline, and after a courtship of two weeks they became engaged to marry. This hectic romance is the active cause of the present controversy. This claim is based on a conversation said to be overheard by Mr. Regetz between Madeline and her father. It was at the home of the decedent and within about a week following the engagement. Madeline went to her father and stated to him her intention to get married. He replied: " You aint going to get married, if you will stay with me as long as I live and stay single, when I die the house and furniture will belong to you." She replied: " Father, if that is the way you feel about it, that is the way it will be." According to this witness this vital matter was settled in that peremptory way.

If we are to adopt and credit this version of the conversation and gauge it according to accepted standards of human conduct, then the reaction to this engagement announcement, both by Madeline and her father seems unnatural. I think that we have the right to infer that she was under emotional tension at the time, yet without protest or expression of disappointment she promptly accepted her father's offer. The opinion of her intended husband was not sought or considered. He testified that he did not mention the fact to either father or daughter that he had overheard the talk between them.

Mr. Kempf was a thrifty man of German birth, not likely to act on impulse. The marriage of a daughter was no novel experience for him. He had seen six daughters select their husbands.

I am unable to believe that the decedent would suddenly become panic stricken and without inquiry or hesitation barter away his home to halt the threatened event. Such a bare framework seems to require far more details.

There was nothing said in this transaction about the decedent

making a will or just how the alleged promise of the decedent was to be performed. The subsequent acts and declarations of the claimant and decedent indicate that neither construed the conversation as the making of a binding contract. There is evidence that subsequently the decedent declared his intention not to make a will and to thus provide equality among his children in the distribution of his property.

He also took some steps with the view of selling his residence and purchasing another.

On the other hand, a neighbor testified to having a conversation with the decedent in 1927 in which he reiterated in substance his promise made to Madeline as testified to by the witness Regetz. This neighbor testified to another incident two years later while he and the decedent were sitting on the neighbor's porch one Sunday afternoon in the month of August. Madeline came over from home and addressed her father saying that she had funny news for him, and that she was intending to be married. Her father expressed his dissent, again repeating his promise about the house and furniture and this time adding new matter that she should have in addition the same share of property as her sisters. Madeline asked in reply if he meant it and receiving an affirmative answer, remarked "that settles the hash." It is difficult to comprehend why Madeline and the decedent should select a neighbor's porch and there publicly discuss such intimate and personal subjects as property, marriage and death. It confuses and serves to discredit to a certain extent the other incident on which the claim is based. On no theory can a fact known for three years be classed as "news." Madeline corroborated this testimony and explained her purpose was to ascertain if there had been any change in intention by her father and to test his financial pulse.

Following the death of the decedent, the attitude of the claimant was inconsistent with her contention now. The undisputed evidence is that while occupying the house she discussed with her sisters the advisability of purchasing it and obtained of them a selling price. They consented to her taking, when ready, what furniture she might need to furnish rooms that she contemplated leasing. Efforts were made by the administratrix to sell the house. The administratrix advertised for claims for the legal period, after which the account was filed and citation issued for a judicial settlement. During this time Madeline filed no claim and made no assertion or protest to the other heirs that she was entitled to the house and furniture. Her claim was served on the administratrix on the return day of the citation. Her explanation is that under the advice of counsel she was waiting to secure witnesses.

This silence waived no legal rights but it is contrary to the usual conduct of claimants, especially among relatives. This brings us to a consideration of the law bearing on claims of this character. Death has sealed the lips of the witness most vital to a just determination of the controversy. Frequently the representative of an estate is unable to produce a single witness to controvert the proof of a claimant. This situation imposes upon a court as a trier of facts the duty of analysis and a testing of proof as far as possible in order to arrive at what convinces him is a just decision.

The Court of Appeals has announced the rule: "A court or jury is not bound to adopt the statements of a witness, simply for the reason that no other witness has denied them. * * * The witness may be contradicted by circumstances as well as by statements of others, contrary to his own, or there may be such a degree of improbability in his statements as to deprive them of credit, however positively made." (Headnote in *Koehler* v. *Adler*, 78 N. Y. 287.)

At the trial certain acts and declarations of the decedent were admitted in evidence which counsel for the claimant argued with much earnestness constituted error. The evidence in the case at bar referred to declarations of the decedent in the absence of the claimant wherein he declared his intention not to execute a will and that his property would thus be equally divided among his children. The other was the fact that the decedent declared his intention of selling his house and purchasing another. No mention was made of the claimant or of any possible claim that she might have.

The rule against self-serving declarations I think has no application to this state of facts. Obviously if the decedent in the absence of claimant referred to his alleged contract and sought to repudiate it, then such evidence would not bind the claimant. Declarations of a decedent tending to sustain a claim against his estate are competent as a concrete expression against interest.

In the nature of things a living person cannot foresee what claims will be filed against his estate so that in that ignorance he may make statements and perform acts inconsistent with the contention of claimants after he is dead. Under the circumstances there is an entire lack of motive or operation of mind to avoid obligation. I think that it is then competent to receive such declarations and proof of such acts as corroborative only, giving to such evidence the weight to which it seems entitled.

There is no evidence in the case at bar that the decedent ever promised to make a will.

The case of *Kenny* v. *Carroll* (207 App. Div. 729) has several

features similar to the case at bar and in which a recovery was denied. It was there held that silence where there was a natural impulse to speak, delay in claiming alleged rights and inconsistent acts all indicated that the alleged contract was an afterthought and not supported by convincing evidence. Courts are unanimous in stressing and emphasizing the necessity that claims of this character shall be established only by clear and convincing evidence.

In *Hamlin* v. *Stevens* (177 N. Y. 39) the court pointed out the inherent danger associated with parol contracts against estates. Such contracts should be in writing, and if not, then parol evidence by disinterested witnesses should corroborate every essential detail of the claim.

In *Mc Keon* v. *Van Slyck* (223 N. Y. 392) the court announced the rule that claims against estates are required to be proven only by a preponderance of evidence the same as a plaintiff in a civil action, but that a court as a trier of facts in determining whether such a preponderance exists, must keep in mind that the alleged promisor is dead and, therefore, unable to speak. They may reject evidence in such circumstances which might satisfy them if the promisor were living.

The claimant and her intended husband must be regarded as interested witnesses. Each filed a claim against this estate and each acted as a witness for the other. The only proof offered by a disinterested witness was the neighbor as to admissions by the decedent. His testimony was somewhat confused and lacking in that clearness essential to carry conviction. This result is natural after a lapse of years.

In *Tousey* v. *Hastings* (194 N. Y. 79) the court said: "Aside from the danger of fabrication, verbal admissions are regarded as unreliable evidence, because experience shows that they are frequently misunderstood, imperfectly remembered and inadvertently made."

There is one feature in the case last cited that runs parallel to the one at bar.

The plaintiff negotiated with the executor for the purchase of the same property that he later claimed to own by virtue of a contract.

I hold and decide that this claim has not been established and it is, therefore, disallowed and dismissed.

Decreed accordingly.