In the Matter of the Estate of EDWARD W. BROWNING, Deceased.

Surrogate's Court, New York County, December 5, 1937.

*N. Henry Josephs* [*Leslie J. Tompkins* and *N. Henry Josephs* of counsel], for Marjorie Browning, petitioner.

*Joseph V. McKee* [*Casimir J. F. Patrick* of counsel], for the Title Guarantee and Trust Company, executor.

*Daniel A. Shirk* [*Daniel A. Shirk, Milton A. Goldiner* and *Edwin R. Wolff* of counsel], for Dorothy Browning Hood, respondent.

*John J. Bennett, Jr., Attorney-General* [*Robert P. Beyer, Assistant Attorney-General*], for unknown infants and beneficiaries of charitable trust, etc.

DELEHANTY, S.   While the probate contest in this estate was still in progress and at a time when no distribution of estate assets could have been made with safety, claimant here, through her general guardian, sought a decree compelling the executor of deceased to pay claims of Marjorie Browning which are outlined in her guardian's petition. To that petition answers were interposed by the interested parties. The issues so formulated were placed upon the reserved generally calendar of the court to await the result of the attempt to probate the fraudulent document propounded as the second codicil of deceased. When the probate proceeding was concluded the issues in this proceeding were restored to the active calendar and a hearing was had at which oral testimony was taken.

In substance the claims seem to be based (a) on contracts alleged to have been entered into between deceased and the natural parents of claimant in the years 1918 and 1923, (b) on a contract with the former wife of deceased also made in the year 1918, and (c) on a further and separate contract with the former wife of deceased made in the year 1923.

Each and every of the claims of Marjorie Browning is dismissed on the merits. The court holds that there never existed any basis to such claims and that the proof furnished in support thereof is not entitled to credence. The testimony given in support of the claims is in direct contradiction to the records of this court, is in direct contradiction to the acts of the parties while deceased was living and is contradictory of all the probabilities derivable from known and undisputable facts. The case is of the sort which evoked the condemnation vigorously stated by the Court of Appeals in *Hamlin* v. *Stevens* (177 N. Y. 39, 47, 50) and *Rosseau* v. *Rouss* (180 id. 116). While the discussion of the evidence required to support claims against dead men's estates was stated too broadly

in *Hamlin* v. *Stevens,* " the triers of the facts must not forget that death has sealed the lips of the alleged promisor. They may reject evidence in such circumstances which might satisfy them if the promisor were living." (*McKeon* v. *Van Slyck,* 223 N. Y. 392, 397, 398.) Every element adverted to by the Court of Appeals in these opinions respecting the danger of admitting the validity of claims such as are here made in behalf of claimant is present in this record. The proof of the bargains said to have been made by the natural parents of claimant is contradicted by the tenor of the consents to adoption which they signed in the presence of one of the surrogates of this court. The agreement of adoption and the conduct of the natural parents since the adoption and until after the death of deceased compel disbelief in the story now told. The testimony of the former wife of deceased is contradicted not only by the same instruments executed by her in this court but by her words and conduct throughout the controversies that raged between deceased and his former wife. If there were any substance to the claims now asserted as based upon an agreement with her, she would have spread her version on the records of her *inter vivos* conflicts with deceased and would have made her support of her adopted child the basis for further claims against deceased. Her life with her adopted daughter apart from deceased, her acquiescence in her adopted daughter's complete lack of contact with deceased and the latter's acquiescence for many years prior to deceased's death in a scheme of existence which ignored deceased — all render impossible of credence the version given of the purported contracts with the former wife of deceased.

Separate comment may be warranted on the testimony of persons who were called as witnesses to support the claim of contract and who are not directly interested in the result. These witnesses undertook to repeat the exact words alleged to have been used by deceased on occasions where his exact language was at the time of no consequence at all to any of the persons who professed to recall it. It is the common experience of trial judges that witnesses in good faith repeat their versions of transactions because they have in effect hypnotized themselves into believing that they recall something which in truth they never heard. A commentator on the defects in human testimony has said:

" In the case where the sound is articulate, as in overhearing a conversation, we are in the presence of still other sources of error, due to illegitimate inference and the association of ideas. For words which are not heard will be supplied by the witness in all good faith. He will have a theory of the purport of the conversation, and will arrange the sounds he heard to fit it. * * *

"But now let us suppose that our witness, through the medium of his imperfect senses and his partial attention, has received a certain image. What deformations may it suffer before it is produced as his evidence? If his memory of the incident has ' lapsed ' the image will undergo comparatively little alteration, but if it has often been called to mind it will probably suffer a very considerable change. Each time the image is recalled it will suggest others; the creative imagination gets to work, altering the emphasis, adding particulars, obliterating others, and the result will be as much a work of art as the reproduction of a fact. This tendency is particularly to be noticed with women, and with certain ' excitable ' types; it may be almost a national characteristic, as with Gascons and Sicilians. But all witnesses are prone to this kind of inaccuracy. * * *

"When the witness is not isolated, but is a member of a group, the defects we have before noted, due to the creative imagination, are likely to be accentuated. The event will have been discussed and a uniform version gradually prepared. It is almost impossible, from the unanimous testimony of a number of witnesses who have been in consultation, to extract the original perceptions." (J. W. N. Sullivan, Human Testimony.)

It would not be just to ascribe intentional falsity to the witnesses who offered their recollection of words uttered more than a decade ago in their effort to promote the cause of the claimant with whom or with whose foster mother they are on friendly terms. The court may not regard such proof, however, as constituting that clear and convincing evidence which should be required if claims such as these are to be sustained.

The closing argument of the attorney of record for petitioner perhaps contains a suggestion that by an allowance to claimant the court should readjust the property dispositions made by deceased so as to do what counsel thinks deceased ought to have done for claimant; and perhaps a suggestion that the court should look with an approving eye upon evidence which in a less appealing set of circumstances would be rejected out of hand. Perhaps the court has misapprehended the nature of the argument presented by counsel. In any event the court cannot so decide cases. This case lacks any basis in fact to support the claims and they must be and are dismissed on the merits.

There is presented by tendered proof in this case and the court's rulings excluding it a question of law upon which some comment ought to be made. In *Rosseau* v. *Rouss* (*supra*) it was held by the Court of Appeals that section 829 of the Code of Civil Procedure (now Civ. Prac. Act, § 347) forbade the giving of testimony by the

mother of a child in whose behalf an action was brought against the estate of the alleged promisor. The alleged bargain upon which the child in the cited case was seeking to recover was made by his mother with the deceased. The question presented by such proof in the case of *Rosseau* v. *Rouss* is identical in legal effect with that presented here. The witness in the cited case was the person who was said to have made the bargain upon which recovery was sought. The evidence offered in this case is that of persons who are said to have made the respective bargains with deceased on which claimant relies. On the trial the court held that it was bound by the ruling in *Rosseau* v. *Rouss* and excluded the tendered testimony. The court adheres to that ruling. *Rosseau* v. *Rouss* was criticised in *Ward* v. *New York Life Insurance Co.* (225 N. Y. 314, 322). However, in *Croker* v. *New York Trust Co.* (245 N. Y. 17, 23) Judge POUND wrote for a unanimous court and, after having commented that the broad authority of *Rosseau* v. *Rouss* had been somewhat shaken by the case of *Ward* v. *New York Life Insurance Co.*, continued: " But as stated by CULLEN, Ch. J., in his blunt and vigorous concurring memorandum in that case, the general rule remains, that when a third person sues on a contract made for his benefit he derives his interest from the party who furnishes the consideration for the contract and is incompetent as a witness to personal transactions and communications between himself and the deceased. Under this rule, plaintiff, promisee, was clearly incompetent to testify to personal transactions with the deceased promisor for the benefit of the third party beneficiaries." This reaffirmation in 1927 of the rule in *Rosseau* v. *Rouss* forbids admission of the tendered evidence of the respective promisees. If there is to be reversal of the rule so declared it can be made only in an appellate court. Trial courts are bound to follow the rule.

Submit, on notice, decree denying on the merits the prayer of the petition.