## BUTCHER v. GEISSENHAINER.

(Supreme Court, Appellate Division, Second Department. ⁎ March 11, 1908.)

1. EVIDENCE—OPINIONS—CROSS-EXAMINATION.
   In an action against an executor to recover for services rendered testator during his declining years, it was prejudicial error to exclude a question asked a witness on cross-examination whether the valuation she placed on plaintiff's services was based on the testimony given in the case.

2. EXECUTORS—ACTIONS FOR SERVICES TO DECEDENT—EVIDENCE.
   In an action against an executor to recover for services rendered under an oral contract, the contract must be established by the clearest and most convincing testimony, given or corroborated by disinterested witnesses.

3. SAME—QUESTIONS FOR JURY.
   In an action against an executor to recover for services rendered his testator, held error, under the evidence, to send the case to the jury.

Appeal from Trial Term, Nassau County.

Action by Elizabeth Butcher against Jacob A. Geissenhainer, executor. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Reversed.

Argued before JENKS, HOOKER, GAYNOR, and MILLER, JJ.

Carlisle Norwood, for appellant.

Charles A. Flammer, for respondent.

MILLER, J. This is said to be an action for services; in effect it is an action to recover damages for the breach of a contract alleged to have been made by the defendant's testator to leave by will all his property to the plaintiff and three sisters. The plaintiff has recovered the sum of $17,000 as the value of the services alleged to have been rendered by her pursuant to and in consideration of said agreement. The complaint alleged that the services began in 1889; on the trial the plaintiff sought to show that the contract was made in the spring of 1891, and that said services were rendered from that time to the death of the testator on March 3, 1906.

It is important to understand the situation and relation of the parties at the date of said alleged contract. Said four sisters, Isabelle, Elizabeth (this plaintiff), Eugenie, and Florence, were respectively 26, 20, 16, and 14 years of age. Their mother was dead, their father, though living, did not provide for them. They were living with an older married sister. Isabelle had been employed by a furrier at a salary of $18 per week, but had just been thrown out of employment by the failure of her employer; the plaintiff was employed as

a milliner at $10 per week; Eugenie was at school intending to become a teacher; Florence had been studying stenography and typewriting, but had ceased that study because said testator did not think it necessary for her to continue, for the reason that he did not consider her strong and intended to look after her. He was a childless widower, then about 65 years of age. He had retired from the practice of his profession, and lived at his country home at Sea Cliff, Long Island. He was the intimate friend of said sisters, and regarded himself as their guardian and protector. There is testimony to the effect that he had promised their mother to look after their welfare. The only direct evidence to establish the contract is the testimony of Florence, respecting a conversation between said sisters and the testator at the St. Denis Hotel in New York in the spring of 1891, where they were in the habit of meeting frequently. I quote from her testimony as follows:

"He said he had built this house in Sea Cliff for us. It was to be our home. He wanted us to go there and live, making it our permanent residence; and if we would give him our time in our youth to brighten his declining old days, he in return would leave us all his Sea Cliff property and personal property at his death, provided we remained with him to the end. If one married the obligation was canceled. That is about all. We all went to Sea Cliff after that—after that understanding; we went by train."

The corroborating evidence consists of testimony respecting statements and admissions made by the testator, expressions of affection for "the girls" as they were called, of gratitude for their attentions to him, and of an intention to leave them his property. One witness testifies to an admission of a promise to leave "the girls" his property if they remained with him until his death.

The testator built a house for said sisters near his own residence in Sea Cliff, where they went to reside in the spring of 1891; subsequently he deeded that property to Isabelle, and said, according to the testimony of the plaintiff's witnesses, that the deed was intended for the benefit of all "the girls." In 1894 Isabelle entered his household as housekeeper. She managed his household, attended to his business affairs, and looked after his personal wants, and for that was regularly paid $35 per week, $10 of which she gave her three sisters for the payment of their household expenses. The testator had his own servants, a gardener, coachman, housemaids, etc. Aside from the weekly wage paid to Isabelle, said sisters had no visible means of support but they lived and dressed well. In 1897 Florence married. At that time, or shortly before, the testator gave her $600, besides china, cutlery, and furniture. In 1904 he conveyed to her in trust for her children four lots worth $2,000. It appears that he was in the habit of giving the other sisters money by check, but the extent of his benefactions was not shown, and can only be inferred from their manner of living, and from the fact that they were wholly dependent upon him. While three of the sisters lived in their own home they practically made the testator's home their home, frequently ate at his table, accompanied him when he went riding, on pleasure trips, and on frequent trips to New York. He called them his adopted girls, and treated them as members of his own family. Accord-

ing to the plaintiff's evidence he was a generous, kind, honorable man. His will was made November 1, 1901, by which he gave all of his property to his brother and sister. He had made a similar will in November, 1895. It appears that because of a weakness of his ankles he required assistance in getting in and out of a carriage, but he was able to help himself and go about unattended up to within a short time before his death. Some time (how long does not appear) before his death, because of a physical infirmity, attendance upon him was at times disagreeable.

The testimony to establish the nature and extent of the services rendered was supplied by witnesses who had seen the plaintiff riding with the testator, and showing him personal attentions in his home, reading to him, fetching articles for him, putting pillows under his head or covering him with a rug when he lay down, in short showing that courtesy and personal consideration to be expected from one who was the recipient of his bounty. There is some testimony that on a few occasions the plaintiff assisted Isabelle in the personal attendance occasionally required by the physical infirmity alluded to supra. The witnesses on this head testified to the services as rendered by the sisters collectively, and it is evident that they were speaking chiefly of services rendered by Isabelle.

To prove the value of her services the plaintiff called a witness who had been engaged in the business of supplying attendants, housekeepers, readers, companions, etc., and who testified that the value of the services of a woman companion, attendant, or valet, reader and nurse at times, to a man 65 years of age was from $1,200 to $1,500 a year. It is obvious that testimony respecting the usual compensation paid companions, attendants, etc., could furnish no proper basis for judging the value of the services rendered by the plaintiff, at least without taking into account all the peculiar circumstances existing in the case. It appeared that said witness had heard all the testimony given in the case; on cross-examination she was asked whether the valuation given by her was based in part on such testimony, but the question was excluded. This was prejudicial error, the defendant had a right to find out everything considered by the witness in giving her answer as to the value of the services. We do not discuss the point, because the important question to be determined in this case is whether on the merits the verdict of the jury should be permitted to stand.

Considering the situation of the parties and the nature of the services rendered, it is obvious that the law presumes that they were rendered gratuitously. This point need not be discussed, as the learned justice presiding at the trial charged the jury that the plaintiff could not recover without proving an express contract to pay for said services; thus the question is presented whether the testimony to establish the contract is of the clearest and most convincing character, and given or corroborated in all substantial particulars by disinterested witnesses, as is required in cases of this

109 N.Y.S.—11

kind. Roberge v. Bonner, 185 N. Y. 265, 77 N. E. 1023; Rosseau v. Rouss, 180 N. Y. 116, 72 N. E. 916, and cases cited. The only direct testimony is that of the sister Florence, one of the contracting parties, who testified to a conversation occurring 16 years before when she was 14 years old. She forfeited her interest in the alleged contract by getting married, but she has that bias which results from relationship, and the natural desire to see her sister succeed in her suit. None of the alleged statements and admissions have any probative force, save possibly one, and even an admission of a promise to leave property by will on a given condition is not probative of a binding contract to do so, because such promises are frequently made under circumstances which preclude the idea of an enforceable contract. Moreover, evidence of admissions, always weak, is entitled to but little weight in this class of cases. The effect of such evidence in such cases has been the subject of discussion by the Court of Appeals, and need not be further considered now. All the surrounding circumstances show that the testator assumed the attitude of a protector and benefactor, not of an employer, of these girls. Undoubtedly he persuaded them to go to Sea Cliff and to accept his bounty, but the fact that three of them were infants, two of the tender years of 14 and 16, with no means of support, tends strongly to show that nothing more was intended than a kind offer to provide a home and support, and there is no question that that support was liberally supplied so long as he lived. The will made in 1895 and practically republished in 1901 is another strong circumstance, in view of the character given the testator by the plaintiff's own witnesses. But a stronger circumstance still, and one which to my mind entirely discredits the plaintiff's case, is the fact that in 1894 Isabelle, the oldest, entered the testator's employ at a regular salary. That contract of employment is irreconcilable with a contract to pay for those services by will. These girls doubtless hoped that the testator's benefactions during life would not terminate upon his death, perhaps they had reason for that hope, and it may be that in the long run it would have been better for those who did not marry had they not learned to be dependent; but I think it is clear from this record that in giving up a position as milliner at $10 per week for a life of comparative ease and luxury, the plaintiff made no great sacrifice. It is easy to perceive how the hopes and expectations of 15 years may have so affected the mind of the witness Florence that she now recalls as a binding contract what was only a generous offer of support. Human memory is so frail, so liable to be influenced unconsciously, and it is so easy by slight verbal changes to give a conversation a different meaning from that intended, that her recollection now of a conversation in 1891, when she was but 14, should not be permitted to overcome the controlling force of undisputed circumstances. We have reached this conclusion without regard to the positive denial of Isabelle that any such conversation as testified to ever occurred in her presence.

As the case must go back for a new trial, we should say whether upon the record before us the complaint should have been dismissed

by the court. It may be granted that there was some evidence tending to establish the contract, and in an ordinary case enough to go to a jury. But the Court of Appeals has established the rule that in this class of cases the testimony must be not only clear and convincing, but of the clearest and most convincing character, and given or corroborated in all substantial particulars by disinterested witnesses, and it must follow that in order to take such a case to a jury more is required than will ordinarily suffice. Of course, no precise rule can be laid down for determining when such a question becomes one of fact, but the court must determine in the first instance whether the testimony is of the required character. This discussion has been fruitless if it has not demonstrated that no reasonable man can say that the testimony to establish the alleged contract is of that character, therefore a jury should not be permitted to say that it is. While it is true that a claim against a decedent's estate is as meritorious as any, a different rule of proof is required in cases which are justly the object of suspicion, easily fabricated, and with difficulty disproved. The plaintiff's case is burdened from the start with that suspicion, and it must be considered by the court in determining whether there is a case for the jury. While it is true that it is the province of the jury to weigh the testimony, preliminary to that the court must determine as matter of law whether the rule of proof required has been complied with. The plaintiff has recovered the value of the services rendered by herself and sisters collectively, and if the judgment can be sustained each one in turn may recover a like sum; but the law wisely interposes the rule above stated to prevent such raids on the estates of decedents. Without attempting to lay down any rule for this class of cases, we hold that upon the record before us it was error to send the case to the jury.

The judgment and order must be reversed.

Judgment and order reversed, and new trial granted, costs to abide the event. All concur.