In the Matter of the Estate of M. Emeline McMillan, De-
ceased; Pauline A. Piffard, Petitioner, Respondent;
Louise C. Adenaw, as Executrix, etc., of M. Emeline Mc-
Millan, Deceased, and Others, Appellant.

(*Supreme Court, Appellate Division, First Department, May 14, 1915.*)

Decedent's estate—Agreement between decedent and her niece for
mutual maintenance of home construed—Sufficiency of evidence to
establish such agreement after death of one of parties—Interested-
witness.

In a proceeding to have the real estate of a decedent sold for the pay-
ment of her debts, it appeared that the decedent and her niece had been
very friendly for a number of years, and that the niece had lived with the
decedent and contributed to the maintenance of the home, and in the
absence of a will would have been entitled to one-half of her estate.
Upon the marriage of the niece, it was claimed that she entered into an
oral agreement with the deceased, by which she agreed to purchase an
estate, repair and furnish it and establish a joint home, the deceased
agreeing to pay $100 a month for at least eight months in the year, and.
$100 a month for any of the other four months in which she might remain
there, with provisions in regard to horses and carriages and a maid. It.
was further claimed that the deceased agreed upon her death to leave to·
the niece a sufficient amount of property by will to produce an income·
equal in amount to the sum which she was to contribute annually to the·
support of the home, and for that purpose to leave to the niece the
equivalent of the value of one-half of her interest in certain real prop-
erty. The deceased moved into the new home, taking her furniture, and
after living there for some time, and paying her share of the expenses,
pursuant to the agreement, went away, apparently for a visit, but never·
returned. She died, leaving a will in which no mention was made of the
niece, all her property being left to other relatives. After the deceased
left the home established by the niece, but before her death, demands
were made upon her for amounts due under the alleged agreement, and
in a replevin action by her to recover her furniture the niece set up as a
counterclaim the amounts due under the agreement.

In this proceeding the petitioner bases her claim upon the agreement
and her main witness is her husband, who, having no property or busi-
ness, married her when he was about fifty years of age. There were no
papers containing any support of the alleged agreement, although a
number of letters of the deceased were in evidence.

*Held,* on all the evidence, that the agreement should be sustained so far as it related to the mutual obligations of the parties during the life of the deceased, but that the evidence is insufficient to sustain the finding of any valid contract affecting the disposition of the deceased's property after her death;

That, although the petitioner's husband may not have been incompetent as a witness under section 829 of the Code of .Civil Procedure, he was an interested witness and as such his testimony cannot be regarded as of a quality sufficient to support the entire agreement.

INGRAHAM, P. J., dissented, with opinion.

APPEAL by Louise C. Adenaw, as executrix, etc., and others, from a decree of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 23d day of September, 1914, confirming the report of a referee in the proceeding to have the real estate of the decedent sold for the payment of debts, directing said sale and adjudging that the estate of M. Emeline McMillan is indebted to the petitioner Pauline A. Piffard in the sum of $69,802.69, with interest and costs.

William Ritchie of counsel (Albert Ritchie with him on the brief), for the appellants.

Timothy A. Leary of counsel (John F. Connor, attorney), for the respondent.

CLARKE, J.— This decree is based upon the finding that on or about the 30th day of October, 1898, at Geneseo, Livingston county, N. Y., the said Pauline A. Piffard and the said M. Emeline McMillan entered into an oral contract and agreement conditioned upon the subsequent purchase by said Pauline A. Piffard of the Piffard homestead, wherein and whereby it was mutually agreed by each of the parties as follows:

The said Pauline A. Piffard, on her part, agreed at her own cost and expense to purchase for a home a certain residence and property at Piffard, Livingston county, N. Y., known as the

Piffard homestead and containing about forty-two acres, together with an additional nearby parcel of land containing upwards of eighteen acres, providing the same was sold at such a price as to come within her means; to put the said homestead in good repair and maintain the same as a home for herself and the said M. Emeline McMillan during the latter's lifetime; to give the said M. Emeline McMillan first choice of the rooms in the said house for use as her private apartments as well as the general use of the premises as one of the family; to provide the said M. Emeline McMillan with barn room for carriage and wagons; to provide stabling for the horses of the said M. Emeline McMillan and to suport these horses for her, charging her no more than the actual cost of so doing; to cater and provide for the table so as to meet with the needs and desires of the said M. Emeline McMillan; to provide and keep a man on the premises whose duties should be those of a gardener, chore man in and about the house and farm, and that when the man needed additional help in carrying on the work on and about the place, in the way of men and teams, to provide the same at her own expense; to purchase and maintain on said place a sufficient number of cows to keep the establishment in milk, cream and butter, and a sufficient number of fowls to supply eggs and young poultry for the said home; to manage a large garden upon the said place containing about an acre and a half of land so as to supply the said family with all necessary vegetables, small fruits and flowers for their support and comfort; to provide all necessary additional furniture to comfortably furnish the said house after the said M. Emeline McMillan had placed therein the furniture and other household belongings she had in the Colt house, in Geneseo, N. Y.; to maintain such furniture in good repair, and from time to time, as the same became worn or unfit for use, to replace them at her own expense; and to provide the necessary help to maintain and run said household.

The said M. Emeline McMillan, upon her part, contracted and

agreed in the event said Pauline A. Piffard should purchase the said Piffard homestead to go to the said Piffard homestead with the said Pauline A. Piffard and her family and make her home there during the balance of her life; to pay the said Pauline A. Piffard $100 a month for eight months of each year for the maintenance of said home, and if the said M. Emeline McMillan remained therein for a greater period of time than eight months in any one year, to further pay the said Pauline A. Piffard at the rate of $100 per month for each month of such overtime; to place in the said home the furniture and other household belongings which the said M. Emeline McMillan then had in the said Colt house in Geneseo, N. Y., and contribute them so far as they would go toward the furnishing of said new home; to leave such furniture there during her lifetime, and that at the death of said M. Emeline McMillan the said furniture was to become the property of the said Pauline A. Piffard, excepting such articles of furniture and bric-a-brac as the said M. Emeline McMillan wished to give away to other members of her family and friends for keepsakes; that she should not cause to be removed from any one room for that purpose a sufficient amount of furniture to deplete the furnishing of that room; to keep a maid to wait upon and take care of her, the said M. Emeline McMillan, and to have the said maid do a sufficient amount of work in the said household to pay for the said maid's board; to purchase horses and a carriage with the necessary equipment for the same and to maintain them and to employ a coachman for the general use of the said family; and when she, the said M. Emeline McMillan, died, to leave to the said Pauline A. Piffard a sufficient amount of property by will to produce an annual income equal in amount to the sum which she was to contribute annually towards the support of said home so that the said Pauline A. Piffard could continue the said home after the death of the said M. Emeline McMillan in the same fashion as during the latter's lifetime, and for that purpose to leave to the said

Pauline A. Piffard the equivalent, in cash or other securities, of the value of one-half of a two hundred and eighty-seven twelve hundredths undivided interest in the aforesaid real property, located at 152 Broadway in the city of New York, reserving the privilege or option, however, of satisfying this obligation by leaving to the said Pauline A. Piffard instead of such cash or other securities, one-half of the said undivided interest in said real property itself and that she had, as petitioner then knew, theretofore made a will in which she had given petitioner one-half of her interest in the real estate known as No. 152 Broadway, New York city.

Mrs. Piffard was a niece of Mrs. McMillan, and if she had died intestate would have been entitled to one-half of her estate. Mrs. McMillan was born in 1832. In 1885 Mrs. McMillan and her niece, then Pauline Arthur, were together in Rome, Italy, where Pauline's mother had died. For many years thereafter she and her niece traveled and lived together. They had at one time a family home in Washington, D. C., which was broken up by several deaths. They had a home in Geneseo, N. Y., which Mrs. McMillan maintained and conducted, to the upkeep of which the niece contributed. In February, 1898, Miss Arthur married D. Halsey Piffard. The contract set forth *supra* was alleged to have been made in November, 1898. It involved the purchase of the property known as the Piffard estate by Mrs. Piffard for some $5,000, the repair and furnishing thereof which cost about $6,000 more, and the setting up of a joint home; Mrs. McMillan to pay $100 a month for at least eight months in the year, and $100 a month for any of the other four months in which she might remain there, and with provisions in regard to horses and carriages and a maid. The property was bought and repaired. Mrs. McMillan took her furniture there. Mr. and Mrs. Piffard and Mrs. McMillan moved into the house in May, 1899, and lived on this property from that time down to October, 1902, when Mrs. McMillan went away,

apparently for a visit, taking a few of her things. She never returned to reside there. She died in 1907, leaving a will in which no mention was made of Mrs. Piffard. All her property was left to her other relatives.

In 1904 Mrs. Piffard's attorney sent to Mrs. McMillan the following written demand: " The undersigned hereby demands from you that you fulfill and carry out your contract, made with her on or about November 2, 1898, and that you pay to her the sum of $1,750, with interest thereon, from the first day of June, 1904, as an amount due under the aforesaid contract, the items of which may be more particularly set forth as follows:

" To maintenance or contribution toward the home at the rate of $100 per month for eight months...... $800
" For damages by reason of your failure to furnish for the use of the home a carriage, team or conveyance with proper equipment, and a man to care for the same and to render services in and about the home and premises, and for your failure and neglect to furnish a maid to render services in and about the premises, under the provisions of your said contract, in the sum of.................. $950

$1,750

" Dated August 2, 1904."

And in August, 1905, another demand was sent to Mrs. McMillan in the same form with the addition of this claim: " The undersigned likewise demands the sum of $1,750, heretofore demanded from you, with interest thereon from June 1, 1904."

This case is differentiated from many of the cases under which similar contracts have attempted to be established in the courts, after the death of the testator, in the fact that these

demands were made in her lifetime and that in April, 1906, Mrs. McMillan brought suit in the Supreme Court, county of Livingston, against Mr. and Mrs. Piffard in replevin for her furniture which remained in the house after her departure in 1902, valuing said chattels at $2,215.70, and that in the answer in said suit Mrs. Piffard set up as a counterclaim this oral agreement.

Mrs. McMillan's testimony *de bene esse* was taken before a referee, and, upon trial of that replevin suit, so much of it as applied to the ownership and possession of the chattels sued for was read in evidence, she having died before the trial. The trial court, over objection to its competency under section 829 of the Code of Civil Procedure, admitted the testimony of Mrs. Piffard in regard to that contract and other personal communications to and transactions with Mrs. McMillan upon the ground that the door had been opened, not only in regard to the chattels, that is to say, in defense of the cause of action, but in support of the counterclaim. Upon that trial defendants had a verdict upon the counterclaim for $55,818.92, on which judgment was entered for nearly $60,000. Upon appeal to the Appellate Division (Adenaw v. Piffard, 137 App. Div. 470) this judgment was affirmed by a divided court. The main point discussed was the admission of Mrs. Piffard's testimony. The majority of the court said also (2) " We think the counterclaim maintainable, though plaintiff's testatrix was living when the action was commenced. She having refused to carry it out repudiated it."

Presiding Justice McLENNAN, with whom Justice KRUSE concurred, dissented, writing an opinion holding said testimony inadmissible, also saying: " I think also that there was no consideration for the agreement which is the basis of defendants' counterclaim in this action. By the terms of the alleged agreement entered into between the deceased and the defendants, provision was made for ample payment by the deceased for all

services rendered to her. Her board and that of her maid, the care of the horses, wagons and coachman were all provided for by the terms of the oral agreement. It is not suggested that the payments so agreed to be made by the deceased were not ample for the services rendered, and I think it cannot be determined, even construing the evidence of the defendants most favorably to them, that there was any consideration for the alleged agreement on the part of the deceased to will or transfer to them upon her death property of the value of between $50,-000 and $60,000. Finally, I conclude that the defendants did not establish their alleged counterclaim by such proof as would entitle them to recover under the rule as laid down by the Court of Appeals in Hamlin v. Stevens (177 N. Y. 39)."

On appeal to the Court of Appeals (202 N. Y. 122) the judgment of the Appellate Division was reversed by a unanimous court, WILLARD BARTLETT, J., writing, and it was held that the evidence was clearly inadmissible and that the door had not been opened to permit Mrs. Piffard to testify as to the alleged counterclaim. The court *inter alia* used this significant language: " This record presents a striking illustration of the perils of litigation. An old lady commences a lawsuit to recover possession of $2,000 worth of personal property, and as the outcome her estate is cast in damages in the sum of nearly $60,000."

In this proceeding the main witness for the petitioner is her husband, D. Halsey Piffard, sixty-four years of age, who, having known Miss Arthur all her life, married her when he was upwards of fifty, he then having no property or business and never having had any since. His testimony, direct and cross, takes up 249 pages of the record.

The other testimony was given by a sewing woman, Miss Mary E. Hennessy, who went to take care of Mrs. McMillan in 1900 and was with her for five weeks. She testified that on the first day of their acquaintance Mrs. McMillan said to her:

8

" I have divided my silver during my lifetime so I know where it goes." · "And I said to her, ' Is not Mrs. Piffard your daughter?' She said, ' No, she is my sister's daughter.' I said, ' Then she is not your only heir?' She said, ' No, I have five living relatives. I have Mrs. Piffard and my brother John and he has three children, but Mrs. Piffard lived with me since her mother's death and at my death Mrs. Piffard is to inherit one-half of my property and my brother John and his family the other half, and she gets the greater share because she gets the bulk of this furniture.' " On the next day she testified that she asked Mrs. McMillan if she did not own the house. " She said ' no, Mrs. Piffard put her money in the house and it was all her money that bought the house,' and she said ' I agreed to furnish it and contribute toward the maintenance of it as she did with me when I lived in Geneseo.' She said that before then she had kept house at Geneseo and Mrs. Piffard had lived with her and given her a yearly allowance. She said, ' I kept house and Mrs. Piffard gave me an allowance yearly and now I am in feeble health and I do the same by her, I contribute.' She did not say what amount. She said ' I contribute for the maintenance of the house.' " The witness further testified that in 1904 she saw Mrs. McMillan at Lauderdale's house on an occasion when a registered letter came containing the demand from Mrs. Piffard. " Mrs. McMillan * * * said, ' I have told Mrs. Piffard I would leave her one-half of my property and my brother John one-half." That in 1905, three years after Mrs. McMillan had left the Piffard house after a partition suit had been tried and before the trial of the replevin suit, " She [Mrs. McMillan] was speaking about leaving the Piffard homestead. She said, ' I was given to understand that a verbal contract was not binding,' and she said ' if a verbal contract is binding why I have lost one suit and I probably will another.' "

Ellen Long, a nurse, testified that in April, 1899, Mrs. Mc-

Millan was talking to her about moving over to the Piffard homestead, and she said " that she had agreed to leave enough property to maintain　*　*　*　the Piffard home. She told me about Mrs. Piffard going over to buy the home and how she agreed to leave property enough to maintain that home just the same after her death as she promised to now."

Upon the trial of the replevin suit four years earlier she had not testified to any such conversation.

Elizabeth Schneider, cook, testified that Mrs. McMillan in conversations in reference to her relations with Mrs. Piffard " told me she was very dear to her, just as her own child, in place of her own child who had died.　*　*　*　I don't think she mentioned the furniture in particular. She told me everything would be Mrs. Piffard's. She used the word ' everything.' We were talking about a very beautiful picture that was in Mrs. McMillan's room.　*　*　*　She said it would be Mrs. Piffard's when she was gone and that everything would be." This testimony does not seem at all to corroborate the contract alleged.

Hannah Roberts, a nurse, was at Piffards five or six weeks in 1901. She was asked, " What did [Mrs. McMillan] say about the furniture?　*　*　*　A. She said she had taken it there to furnish the house while she was living, and when she got through with it Mrs. Piffard had it.　*　*　*　Q. What did she say to you in reference to an agreement she had made with Mrs. Piffard as to other property? A. She didn't say anything, only what was there would be Mrs. Piffard's. Q. Did you have any conversation about other property? A. No, sir."

This is the utmost of the corroboration of Mr. Piffard's story. There is not a scrap of paper containing any support of the alleged contract, although a number of letters of Mrs. McMillan are in evidence. The judgment, therefore, depends upon the evidence of Mr. Piffard.

It is urged that his testimony is incompetent under section 829 of the Code of Civil Procedure, as " a person interested in the event." I am not willing to say that he comes within the condemnation of the statute as a party legally interested in the event, but I do think that he was an interested witness and that as such his testimony cannot be regarded as of a quality sufficient to support the judgment under the rule laid down in similar cases.

In Hamlin v. Stevens (177 N. Y. 39) the claimant's mother testified to the alleged contract. Judge VANN said: "Assuming that the trial judge believed that the appellant and his mother intended to tell the truth, still, owing to their deep interest, it would be unsafe to base a finding on their testimony when it may be followed by such grave consequences. Such contracts are dangerous. They threaten the security of estates and throw doubt upon the power of a man to do what he wills with his own. The savings of a lifetime may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation, with all the dangers which, as experience shows, surround such evidence. The truth may be in them, but it is against sound policy to accept their statements as true, under the circumstances and with the results pointed out. Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses. * * * We wish to be emphatic upon the subject, for we are impressed with the danger, and aim to protect the community from the spoliation of dead men's estates by proof of such contracts through parol evidence given by interested witnesses."

In Holt v. Tuite (188 N. Y. 17), where the rule in Hamlin v. Stevens was applied, the witnesses whose testimony was disregarded as being interested were in no way legally interested in the estate or the property nor related by kinship to the par-

ties. They were merely involved in certain disputes calculated to excite their ill will against the heirs or representatives of the estate.

In Hungerford v. Snow (129 App. Div. 816) the husband testified to the oral agreement. While the court held that his testimony was competent, it held that the defendant had failed to establish the oral agreement by such clear and convincing evidence as is required under the rule applicable to cases of this kind. In Scheu v. Blum (119 App. Div. 827) the court said: " The existence of the alleged contract of employment depends upon the testimony of her husband. There is no substantial corroboration. Contracts of this kind are looked upon with suspicion and whenever sought to be enforced are closely scrutinized and never sustained unless the evidence is very satisfactory. [Citing cases.] The plaintiff's husband can hardly be said to have been a disinterested witness."

In Dueser v. Meyer (129 App. Div. 598) the testimony was given by the plaintiff's wife and the judgment was reversed upon the ground that such claims have to be proved by clear and convincing evidence of disinterested witnesses before they can be allowed.

In Butcher v. Geissenhaimer (125 App. Div. 272), where the claimant and the witness were sisters, the court said: " It may be granted that there was some evidence tending to establish the contract, and in an ordinary case enough to go to a jury. But the Court of Appeals has established the rule that in this class of cases the testimony must be not only clear and convincing, but of the clearest and most convincing character, and given or corroborated in all substantial particulars by disinterested witnesses, and it must follow that in order to take such a case to a jury more is required than will ordinarily suffice." And the judgment was reversed.

In White v. Devendorf (127 App. Div. 791) the rule was applied to the testimony of relatives.

It is not necessary to reject Mr. Piffard's testimony entirely. Undoubtedly the relations of aunt and niece had been very close for a number of years. They had traveled and lived together almost continuously from 1885, when her mother died. They had lived together in Geneseo, where Mrs. Piffard had contributed to the maintenance of the home, and it is clearly established when the Piffard homestead was bought and they moved there that Mrs. McMillan contributed to the maintenance of that home. As Mrs. McMillan grew older and feebler, suffering as she did from shaking palsy and requiring considerable attention, there is no doubt that Mrs. Piffard was affectionate, considerate and helpful to her. There is no claim for personal services rendered to Mrs. McMillan, so that there is not here presented the question of a contract for personal services or an action in *quantum meruit*. The contract alleged is for contribution to the maintenance of the home. I think that there was an agreement founded upon sufficient consideration whereby Mrs. McMillan agreed to make her home with her niece for the rest of her life and to pay her $100 a month for eight months in the year, and $100 a month for so much of the other four months as she should actually be in the home, and to provide for the horses and carriages and their keep, etc.

After her departure from the Piffard home in October, 1902, she continued to pay for the keep of the horses until she disposed of them in March, 1903, and she continued to make the contribution of $100 a month until May, 1903.

The court found that Mrs. McMillan neglected and failed to comply with the terms of her contract by omitting and neglecting to pay the sum agreed upon for the maintenance of said joint home and by neglecting and omitting to furnish and maintain for the use of said household the team, coachman, carriage and equipment for the year beginning June 1, 1903, and ending June 1, 1904, and by reason of said failure and neglect became indebted to Mrs. Piffard in the sum of $1,600, less the

sum of $156, the value of the board of which Mrs. Piffard was relieved during said year, leaving a total of $1,444, and has made the same finding for each of the four years down to June 1, 1907, which would make a total of $5,776. We think that justice would be done by accepting so much of the testimony as would establish the contract so far as it related to the mutual obligation of the parties during the life of Mrs. McMillan. We do not feel justified in finding any valid contract affecting the disposition of Mrs. McMillan's property after her death. It may be conceded that Mrs. McMillan had at various times, and perhaps for a long time, an intention to leave part of her estate to this niece, yet the circumstances of her going to the Piffard house and the contribution to the maintenance thereof were in entire accord with their previous conduct, and can be entirely explained without referring to the disposition by will of one-half of her property. Within the rule, we find no evidence of the character required sustaining the finding of the court that Mrs. McMillan contracted at her death to leave any of her property to Mrs. Piffard.

Therefore, the tenth, twelfth, sixteenth, thirty-fourth and fortieth findings of fact should be modified, thirty-second and forty-eighth reversed, and the fourth conclusion of law modified.

The decree appealed from should be modified by providing that the amount justly due to the petitioner is $5,776, with interest on $1,444 from the 1st day of June, 1904; interest on $1,444 from the 1st day of June, 1905; interest on $1,444 from the 1st day of June, 1906, and interest on $1,444 from the 1st day of June, 1907, and as modified affirmed, without costs.

McLAUGHLIN, SCOTT and HOTCHKISS, JJ., concurred; INGRAHAM, P. J., dissented.

INGRAHAM, P. J. (dissenting.)— The statement of the testimony by my brother CLARKE and the authorities cited by him establish, I think, that no contract was proved which would justify the court in enforcing it against the personal representatives of the estate. The only substantial evidence of any contract came from the plaintiff's husband, who had no occupation or business and no property, and apparently was supported entirely by his wife, the petitioner in this proceeding. While his testimony may not be incompetent, he was certainly as much interested as the petitioner, whose testimony is incompetent, and as I read it it fails to establish any contract by the decedent to live with the petitioner during her life and pay half the expenses of the establishment which the plaintiff was to provide or to make any provision for the petitioner by will. Undoubtedly if believed it would establish an intention of the decedent to live with the petitioner, but as I look at it it fails to show any enforceable contract made by her to continue such arrangement for any period. The so-called corroborative evidence consists of declarations of decedent as to her intentions, and as I look at it, fails to corroborate the claims of the petitioner that any express contract was made. Now the proof of the alleged contract in case seems to me to be within the principle established in Hamlin v. Stevens (177 N. Y. 39) where the court said: " Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses. * * * We wish to be emphatic upon the subject, for we are impressed with the danger, and aim to protect the community from the spoliation of dead men's estates by proof of such contracts through parol evidence given by interested witnesses." And the same principle has been now firmly established in this State and shown in many cases, some of which are mentioned in the prevailing opinion. Certainly in this case there was not

such testimony of a contract as was required by the Court of Appeals in Hamlin v. Stevens (*supra*) as a basis for a claim against the estate of a decedent, and I think, therefore, the decree of the surrogate should be reversed and the proceedings dismissed.

Decree modified as directed in opinion, and as modified affirmed, without costs.   Order to be settled on notice.