LOUIS KAPLAN, as Executor, etc., of ABRAM KAPLAN, Deceased, Appellant, v. MAX GOODMAN, Respondent.

First Department, May 2, 1919.

Decedent's estate — action by executor upon promissory notes executed by defendant payable to testator — defense — alleged oral contract by testator releasing defendant from liability — sufficiency of evidence to establish said contract — evidence of said contract made prior to issuance of notes in suit not admissible.

In an action by an executor as such to recover upon promissory notes made by the defendant, a nephew of the testator, each of which was payable to the order of said testator, the defense interposed presenting the main issue was that by an oral agreement entered into between the testator and the defendant outstanding notes of the defendant payable to and held by the testator, of which the notes in suit were renewals, were to be deemed paid and discharged in case the defendant and his family furnished certain entertainment, counsel and advise for the testator so long as he should live. It appeared that defendant, learning that the testator had become estranged from his wife and children, took active steps to secure

the good will and affection of his uncle who was then over seventy years of age. The testator in a will executed shortly before his death failed to mention the defendant or to refer to the notes in suit although he had possession of them. The defendant attempted to prove the alleged oral contract by friends and business associates. Evidence examined, and

*Held*, insufficient to justify the submission of the question of the validity of said oral contract to the jury.

Since the alleged oral contract was made prior to the issuance of the renewal notes in suit it was not admissible in evidence to affect the validity of said written instruments.

In the absence of written proof of a clear and convincing character of the existence of an alleged oral contract by a decedent, a claim upon the estate thereunder can only be allowed upon the production of evidence of a quality that leaves no reasonable doubt of the honesty of the claim made.

APPEAL by the plaintiff, Louis Kaplan, as executor, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 14th day of January, 1918, upon the verdict of a jury, and also from an order entered in said clerk's office on the same day denying plaintiff's motion for a new trial made upon the minutes.

*Henry A. Rubino*, for the appellant.

*Joseph Fischer* of counsel [*Herman Joseph*, attorney], for the respondent.

MERRELL, J.:

The plaintiff has appealed from a judgment entered in the New York county clerk's office dismissing plaintiff's complaint, with costs, upon the verdict of a jury in favor of defendant. Plaintiff also appeals from an order denying plaintiff's motion to set aside the verdict and for a new trial upon the usual grounds.

The action is brought by the plaintiff, as executor of the last will and testament of Abram Kaplan, deceased, to recover upon six promissory notes made by the defendant, Max Goodman, each of which was payable to the order of said decedent. The notes in suit were as follows: One bearing date March 30, 1915, for $1,500, payable sixty days after date; one dated April 7, 1915, for $1,500, payable sixty days after date; one dated June 2, 1915, for $1,000, payable thirty days

after date; one dated May 30, 1915, for $1,500, payable sixty days after date; one dated July 9, 1915, for $1,000, payable August 1, 1915, and one dated June 7, 1915, for $1,500, payable sixty days after date.

As a defense to the note for $1,500 dated March 30, 1915, defendant, in his answer, alleges that said note was renewed by the note dated May 30, 1915, but that at the time of such renewal the March thirtieth note was not delivered up to the maker. Defendant also alleges that the note bearing date April 7, 1915, also for $1,500, was renewed by the note of June 7, 1915, for the same amount. It will be noted that defendant's claim as to these two notes of March 30, 1915, and April 7, 1915, each of which matured sixty days after its date, finds corroboration in the circumstance that the notes of May 30, 1915, and June 7, 1915, were made, respectively, at the expiration of the sixty-day periods when said March and April notes were, by their terms, payable. Upon the trial one Daum, a bookkeeper for the defendant, having in charge the preparation and execution of the notes in question and who attended to their proper entry upon the books of the defendant, testified that the May 30, 1915, note and June 7, 1915, note were, respectively, renewals of the notes of March 30, 1915, and April 7, 1915, and that the two notes last mentioned should have been delivered by the payee to the maker upon their renewal, but were not, in fact, so delivered.

As to the note of June 2, 1915, for $1,000, payable thirty days from date, the defense interposed was that on or about the last day of June, 1915, the defendant paid said note by check. The alleged check was produced upon the trial and the transaction was sworn to by the bookkeeper Daum, who testified as to the payment of said note on the last day of June or 1st day of July, 1915.

As to the remaining note of July 9, 1915, for $1,000, Daum testified that this note was given for moneys advanced by the payee to the defendant at that time, and that in reality the note of July 9, 1915, took the place of that of June 2, 1915. Daum testified that the payee stated that he needed the $1,000 at the time when it was paid on the last day of June or 1st day of July, 1915, and that he then stated that

he would repay it to the defendant within a few days, and that on July 9, 1915, he actually did pay said $1,000 to the defendant and took the note in suit, dated on that day, to secure the same.

It is quite possible that as to the notes of March 30, 1915, and April 7, 1915, the notes of May 30, 1915, and June 7, 1915, were renewals. The defendant's bookkeeper, Daum, testified that prior to July, 1913, Kaplan, who was an uncle of the defendant, had loaned the defendant various sums of money, and that in July, 1913, such loans amounted to $2,500 and were secured by notes of the defendant. Daum also testified that these notes were for the most part sixty-day notes, and that the notes of March 30, 1915, and April 7, 1915, were renewals of notes running through the preceding two years, it being the custom of the defendant to renew said $1,500 notes at the end of sixty-day periods during that time, paying interest on the notes when executed in advance for each sixty-day period.

It is quite possible that the defense interposed by the defendant as to the note of June 2, 1915, wherein defendant asserts that said note was paid, may be justified by the facts. However, these six notes were in the possession of the payee at the time of his death, which occurred on July 22, 1915, less than two weeks after the giving of the note of July 9, 1915, for $1,000. Defendant does not dispute that the notes of May 30, 1915, for $1,500, of June 7, 1915, for $1,500, and July 9, 1915, for $1,000, were held by the decedent at the time of his death and were valid claims against the defendant, unless they were paid and discharged by the performance of an oral agreement claimed by defendant to have been entered into between himself and the decedent with reference to said notes on or about July 5, 1913.

The decedent had considerable real and personal property. The defendant was a manufacturer of clothing in the city of New York. The evidence discloses that for some years prior to 1913 and from then on until testator's death, the testator had been accustomed to loan and advance to the defendant considerable sums of money used by him in connection with his business. The notes in suit by no means represent all of the moneys that were advanced by the testator

to the defendant. The evidence of defendant's bookkeeper discloses that aside from the $2,500 indebtedness which existed at the time of the making of the alleged agreement between the parties and down to and including the time when said notes in suit were given, the testator had loaned defendant at various times considerable sums of money, amounting to $12,000 in the aggregate, and which with the $2,500 amounted to $14,500. It is the claim of the defendant, and plaintiff is, of course, unable to dispute it, that of these loans and accommodations made by the testator during the two-year period from 1913 to the testator's death, all but $4,000 had been repaid by the defendant, and that the $4,000 remaining unpaid was represented by the three notes in suit, dated, respectively, May 30, June 7 and July 9, 1915, the first two, as before stated, being for $1,500 each and the last, bearing date July 9, 1915, being for $1,000.

As to these three last-mentioned notes, the defense interposed, and which presented the main issue upon the trial, was that by an oral agreement entered into between the testator and the defendant on or about July 5, 1913, outstanding notes of the defendant payable to and held by the testator, of which the notes in suit were renewals, were to be deemed paid and discharged in case the defendant and his family furnished certain entertainment, counsel and advice for the testator so long as he should live. Testimony was offered on the part of the defense in an effort to establish such an oral agreement whereby it was claimed said three notes in suit were to be discharged, and the full performance thereof on defendant's part in satisfaction of said notes. Upon the testimony presented upon the trial the jury rendered a verdict against plaintiff and in favor of the defendant upon which the judgment appealed from and which dismissed plaintiff's complaint upon the merits was entered.

Upon a careful review of the evidence I am convinced that the verdict of the jury should not be permitted to stand, and that the same was not only clearly against the weight of the evidence, but is unsupported by competent testimony of a quality sufficient in law to establish the existence of the contract under which defendant asserts the said notes in suit were satisfied. At the time of the making of the alleged oral

agreement between testator and defendant, Kaplan, the testator, was an old gentleman beyond the age of seventy years. Just prior thereto, and in April or June of 1913, Kaplan had become estranged from his family. He at that time had a wife and two sons. Business relations which had existed between the testator and his sons were severed and an action had been commenced by Mrs. Kaplan, who was the wife of the testator by a second marriage, to procure a decree of separation from the testator. Then it was, according to the testimony of defendant's witnesses, that Kaplan sought out the defendant and the latter became actively interested in the comfort and welfare of his well-to-do uncle. Asserting that defendant was precluded from testifying in his own behalf by the provisions of section 829 of the Code of Civil Procedure, although defendant did not offer himself as a witness or attempt to relate what occurred between testator and himself, defendant produced upon the trial one Joseph Nast, an alleged resident and businessman of Toledo, O., who furnishes the testimony with reference to the alleged agreement to discharge the notes in suit by the rendition of certain services by the defendant. Nast was a customer and an intimate of the defendant. He was frequently and each month in New York city and in defendant's place of business there, for the purpose of purchasing goods. His stays in New York were usually of a week's duration, but in the month of July he always remained, according to his testimony, two or three weeks. Nast testifies that upon his periodical visit to New York shortly after July 4, 1913, he went to defendant's place of business and found there the defendant, the testator Kaplan, and another man by the name of Max Hirsch. Nast then proceeds to relate, at length and with great particularity, what he claims he overheard of a conversation between the testator and the defendant on that occasion and in which he actively participated. The testimony of Nast, with relation to this occasion was, in part, as follows: " Q. Now state just what you heard, always keeping in mind that I only want the conversation that was had in the presence of Mr. Abram Kaplan, deceased, when you were present. Now tell me what you heard and what was said in his presence? For instance, you came in there? A. Yes, sir. Q. To whom did you

talk first?    A. I stepped up to Mr. Goodman, and shook hands with Mr. Goodman. Then I shook hands with Mr. Kaplan and I says to Mr. Kaplan, ' How are you?  How are you getting along? '   He says, ' Well, you know I am not getting along very well.'   He says, ' I am having all kinds of trouble.'   He says, ' You know my wife is giving me a great deal of trouble; my sons are— I am not connected with my sons, I am not in business with them any more, he says, I am up here, I run up here occasionally, but do not know what to do; and he says I have all manners of trouble.'   He went on to say that he was giving Mr. Goodman some money, a stipulated amount, $2,500.    ' I want Mr. Goodman to take this money, but he won't take it.'   I says, ' Can't you make up with your sons? '   Q. Who said that?   A. I asked Mr. Kaplan; and he says, ' No, I cannot make up with my sons at all.'   I says, ' Why don't you make arrangements with Mr. Goodman? '   He says, ' That is just exactly what I want to do.'   He says, ' I want Mr. Goodman to take this money and take care of me, advise me.   I want to go up to his house.' He says, ' I want to feel that I am at home there.'   He says, ' You know I am an old man.   I have got but a very few years to live.'   He says, ' What can I do? '   He says, ' I have got plenty of money.'   He says, ' I have got a mortgage of $28,000.' He says, ' I have got another mortgage of $10,000.'   He says, ' I have got $10,000 in the bank.'   He says, ' I have got plenty of income.   Mr. Goodman, he has been very nice to me. He takes me out wherever he goes.   Whenever he goes to lunch he takes me out and buys me lunches and gives me cigarettes and treats me better than my children or anybody else has even treated me.'   He says, ' Really, he makes me feel as though I am an object of charity.'   He did not put it just in that way, but that is the way he conveyed it to me. I says, ' I do not think Mr. Goodman is that kind at all.' He says, ' You put yourself in my position; just feel that you have not got a home.   You get up in the morning and do not know where to go or what to do.   I feel that I want some place that I can go to and that I am not — he says, I am not a beggar, I want to pay for what I am getting.'   ' Oh,' I says, ' those things can be arranged very nicely.'   I says to Mr. Goodman, ' You heard what Mr. Kaplan said? '   ' Yes,'

he said, ' I am willing to do all those things for Mr. Kaplan.'
He says, ' there is no necessity for his giving me any money or
anything of that kind.' ' Well,' the old man says, ' I do not
want those things. I have got plenty of money. I have
got enough to live on and I can pay you these things. Every
time you go out you spend money for me. Whenever you
go anywhere you take me along and you spend money.' He
says, ' You never allow me to pay anything.' ' Well,' I finally
says, ' why don't you go up to live with Mr. Goodman? '
' No,' he says, ' I could not do that.' I says, ' Why? ' ' Well,'
he says, ' I go to church, the synagogue every morning, every
Friday, Friday night and Saturdays; ' he says, ' I could not live
with Mr. Goodman and attend the services that I want to.'
I finally says to Mr. Goodman, ' You should make some
arrangement with this old gentleman here.' I says, ' He is
alone in the world.' I says, ' You know an old man of his age
it is pretty hard, he hasn't anywheres to go, he is estranged
from his children. His wife is making him all manner of
trouble, suing him for divorce and the like of that.' One
word led to another, and he says, ' Well, those things can all be
arranged.' I says, ' I will tell you what I will do,' I says to
Mr. Goodman or to Mr. Kaplan, rather I says, ' You loan
Mr. Goodman money, don't you? ' He says, ' Yes, but he
pays me interest.' I says, ' That is all right; he is entitled
to pay you interest.' I says, ' I will tell you what you do.
You make up your mind to go and live with Mr. Goodman.'
He says, ' No, I wouldn't have anything of that kind at all.'
He says, ' The way Mr. Goodman has been treating me and
taking care of me and advising me, he says, I am perfectly
willing that he should go on as he has.' I says, ' You have
loaned him this money and why don't you take it? ' Mr.
Goodman says, ' I do not want to take it. I want to give him
what money is due him.' So I says, ' You want to do what is
right with Mr. Kaplan, don't you? ' He says, ' Certainly I
do. I want to be as nice to him as I know how. Anytime he
comes up here I do anything I can for him. I will advise him
and help him wherever I can and do whatever I can for him.'
I says, ' I will tell you, I can arrange this thing for you people,
I says, you know me well enough.' I called Mr. Goodman by
his first name, Max; and I says, ' Mr. Kaplan, you know me

well enough to know whatever I suggest would be satisfactory.'
He says, ' Anything you say or do I know will be all right.'
So I sat down and I wrote out a little agreement and I says,
' Mr. Goodman owes you $2,500? ' And the old man broke in
again, he says, ' Yes, but he pays me interest all the time.'
I finally got my little agreement finished up and Mr. Goodman
read it over and he says, ' Now it is unnecessary for a thing of
that kind at all.' He says, ' The money that I owe Mr. Kaplan
I am going to pay him. He has my notes which I renewed
from time to time as they become due.' He says, ' Mr. Kaplan
is perfectly welcome to my home and make it his office if he
wants, and go to my house and live, if he wants.' The old
man broke in again. He says, ' You know, Max, I cannot
do that.' He called in German, ' Maxie.' That ·is the
Hebrew or German of Max, I presume. He says, ' I want to
give you that money.' Mr. Goodman says, ' No, I will not
have it.' Mr. Kaplan says, ' I am going to give you that and
I am going to give you more.' So after I had told the old
gentleman what I had ·suggested, he says, ' Yes, that is just
what I want.' He says, ' That is fine.' Mr. Goodman would
not consent to it at all. So one word led to another, and we
finally went out to lunch. We all went out to lunch, Mr.
Goodman, Mr. Kaplan and myself. I believe Mr. Goodman
paid for the lunch; and we came back and I went away and later
in the afternoon I came back again and I found Mr. Kaplan
there; and I had a conversation with Mr. Kaplan alone; and
he says, ' Your idea is just exactly what I want.' I says,
' Why don't you fix it up with Mr. Goodman? ' ' But he
won't do it,' he says, ' he won't take my money. I want to do
it. He has been so good to me I want to do what I can, I
want to give him this money and I want to give him still more.
Whenever I go up to his house — ' I says, ·' Why don't you go
to his house and live there? ' He says, ' That is out of the
question. I could not do that at all, I want to go to the
synagogue on Friday nights and every morning and Friday
nights and Saturdays.' I says that those things could be
arranged very nicely; and I finally suggested to Mr. Goodman
that he prevail upon the old gentleman to go to the house to
live. He says, ' I am perfectly willing if the old man will go.'

I says, ' I suppose your wife would be satisfactory? ' He says, ' I haven't any doubt but that it would be satisfactory to her.' I says, ' Why don't you ask her? ' Mr. Goodman said, ' I will tell you what you do. You come up to the house with me tonight and go up there and we will put the suggestion to Mrs. Goodman.' I says, ' You know women are funny. You cannot tell but Mrs. Goodman might not want to make this arrangement.' ' Well,' he says, ' We will find out when we go up there tonight.' That evening we went up there. Q. Now I want you to go back to the time that you were in this sample room? A. Yes, sir. Q. When you prepared a paper and you say Mr. Goodman read it but would not sign it, did Mr. Goodman make any proposition at that time counter to the one that you had written out? Did he say anything about how he would accede to it? A. Yes, sir. Q. Now, will you direct your attention to that and tell me what did he say was the proposition that he would agree to? What did he say? Mr. Bitterman: Same objection. Overruled. Exception. A. He says, ' I am perfectly willing to take care of you as long as you live. I will do everything in my power for you. I will advise you. You can come here and make your office with us. You can go to my home and live there. Go to my house and do whatever you feel disposed and make your home with us.' Q. See whether I can recall to your mind, without suggesting, what occurred. Was there anything said by Mr. Goodman about what would become of the notes that he had? A. Yes, sir. Q. Now, will you kindly tell me what he said about that? A. He said, ' Those I positively will renew every time that they are due.' The old man says, ' I cannot see the idea of that. What is it for? ' He says, ' I must do that on account of keeping my books straight.' ' Now,' he says, ' Supposing Mrs. Goodman would refuse to take you at my home, I would not be fulfilling my part of the agreement. If, for instance, I should die — ' Q. Die when? A. ' Die before you do, do you suppose I want Mrs. Goodman to have the use of this money and she may not want to fulfill her part of the agreement; so that you can readily see that this thing has got to be done in this form.' He says, ' I cannot have these notes entered into my books.' By the Court: Q. Who said this? A. Mr. Goodman.

By Mr. Joseph: Q. To whom? A. To Mr. Kaplan. He said, ' I cannot have these notes taken out of the books to show it was paid and put them back just at will.' He says, ' We will leave this matter just as it is and I will renew these notes continually.' By the Court: Q. Who said that? A. Mr. Goodman said he would renew the notes as they became due. By Mr. Joseph: Q. What did Mr. Kaplan say to that when Mr. Goodman told him of this? A. He says ' I cannot see the object of that.' Q. What did he finally say? A. He says, ' I want to give it to you.' Q. What did he finally say before you went up to the house? Did he finally say it was agreeable to him, Mr. Kaplan? A. Yes. Q. Did he say that when finally Goodman said he would not do it any other way, did he say, ' All right? ' A. Yes, he said, ' All right.' Q. You know in New York we usually get closer to the proposition. Now you say that the suggestion was made to go up and see Mrs. Goodman. For what purpose, was it expressed? A. Yes, before we went up there. Q. What was said why you were going up to Mrs. Goodman's? A. Going to see if Mrs. Goodman would be satisfied to take Mr. Kaplan, have him come to the house and she would prepare meals for him at different times and try to make it pleasant for the old gentleman."

It will be observed from the foregoing extract from the testimony of Nast how wonderful was his memory and with what particularity he was able to recall, after the lapse of five years, a conversation which he overheard and in which he participated, but in which he had no direct interest or concern. It will also be noted, notwithstanding the facility of the witness in recalling and relating what occurred of other prople's affairs five years before, that it frequently became necessary, in order to establish the alleged contract upon which defendant depends, for counsel for the defendant to lead this willing witness to a marked degree. But at times it is evident that counsel for the defendant feared that this star witness was overplaying the part assigned him, for when Nast, with monotonous repetition, testified as to the expressed willingness of defendant's wife to prepare dishes that would please the palate of the testator, and of the insistence of defendant and his family that the testator come to their house to live,

counsel cautioned his witness not to repeat that so often. Question after question seems to have been asked, mostly without objection on the part of counsel for the plaintiff, whereby this willing witness was led to testify to circumstances in support of this pretended contract. Much more testimony was given by this witness Nast than that hereinbefore quoted, but it is all along the same line, and the mere reading of it impresses one with the fact that it is a fabrication. Nast seems to have been a favored guest at the house of Goodman, and to have been with the latter on frequent automobile trips to nearby summer resorts, and testifies to frequent occasions when he had motored with the defendant and his family when the testator was also a guest of the defendant, and of defendant's uniform insistence on paying all the bills incurred upon such trips. Nast also seems to have been a great confidant of the testator, to whom the testator related the many acts of kindness which he was receiving at the hands of the defendant and his family. Taken as a whole, the testimony of the witness Nast does not bear the indicia of truth. The conversations which he relates as occurring on the occasion shortly after July 4, 1913, are most unreasonable. He tells of the testator being much annoyed because defendant would not accept as a gift the $2,500 loan which he held against him. As detailed by the witness Nast, never was human effort so great as in this case to persuade the defendant to accept a gift from the uncle. While Nast claims that the uncle's every thought seemed to have been to induce his nephew to accept the gratuity of the loan as it then stood and his proclamation of an intention to do more for the defendant in the future and of defendant's constant refusal to be thus favored, no good reason is suggested why the testator, had he so desired, might not have destroyed the notes in question so that upon his death they would not be found among his effects. Not only, according to Nast, was the agreement that the existing notes should be paid by the services to be rendered by defendant to testator, but any notes given in their places as renewals and also other accommodations by the testator to the defendant were to be satisfied by the privilege accorded testator to go to defendant's house when he wished, to go with them upon their trips, and to

receive friendly counsel and advice and other attentions from the defendant and his family. The evidence seems to disclose the conventional relation of rich uncle and expectant nephew. It is quite apparent that when the nephew, this defendant, discovered the fact that his wealthy uncle had become estranged from his wife and children, he at once, with an eye to the future, became solicitious for the welfare of the old gentleman. It is true that Nast testifies that at the talk at defendant's place of business shortly after July 4, 1913, while defendant stated that he was willing that the testator should call the notes paid at his death in case defendant continued to coddle him and the testator continued to receive the hospitality and attention of the defendant and his family, it was left for final settlement until the parties could all meet at defendant's home at dinner on the same evening. Nast testifies, and in this he is corroborated by defendant's wife and daughters, that after the dinner was over all hands adjourned to the porch at defendant's home, and that then Nast broached the subject to defendant's wife in a professed effort to secure her acquiescence to the arrangement made between testator and defendant that the notes should be paid by the rendition of the services by the defendant. Nast testifies of defendant's wife's willingness to agree to such proposition, but the ingeniousness of the situation was rather disturbed by the testimony of the wife of the defendant that she and the defendant had discussed asking the old gentleman to become a member of their family prior thereto. Counsel for the defendant was manifestly disturbed by this testimony of defendant's wife, and at once informed her that he was not asking her with reference to that. It is entirely apparent, as I have stated, that, learning that the testator had broken with his family, defendant, with a manifest desire to obtain the good will of the testator, at once took active steps to ingratiate himself in the latter's affections. According to the testimony of the defendant's wife, testator, prior to the making of the alleged agreement in July, 1913, had seldom, if ever, visited their house. Indeed, she testifies that she does not ever recall his being there in the year 1912, or in 1913 prior to July fourth. From this time on it is evident that defendant and the members of his family left no stone unturned to

win the affection of their uncle.. He was taken on automobile trips; he became their guest at summer resorts; he was sent to the defendant's dentist, and defendant insisted upon paying the dentist's bill. When he came to defendant's house, which was almost daily, defendant's children removed his shoes and placed his feet in comfortable slippers; another member of the family brought his smoking jacket; and the wife of defendant prepared, at great pains, certain dishes to tickle the palate of the old gentleman; and every effort was made to ingratiate the defendant and the members of his family in the uncle's affections. That the uncle was not unappreciative of these attentions appears from the fact that during the two years immediately preceding his death and following defendant's frantic and not unostentatious efforts to make him comfortable, the old gentleman presented the defendant and the members of his family with considerable sums of money, admittedly $1,500, and probably much more. For these gratuities he received no security whatever, and evidently they were intended as gifts from the uncle to the nephew and members of his family.

The idyllic relations between the wealthy uncle and defendant's household, as portrayed by Nast and other witnesses friendly to defendant, seem only to have been interrupted by the old gentleman's sudden demise, which occurred on July 22, 1915. Three days prior thereto the defendant and his family had gone to the Catskills for a vacation. The uncle, according to the testimony of the defendant's wife, although urged to accompany them, under the advice of his physician remained in his home. He passed away during their absence from home. After his death and notwithstanding the alleged estrangement from his wife and the members of his family, the will of the uncle was produced, which was executed on July 18, 1915, but four days before his death, and while he held the notes in suit. Notwithstanding the mass of testimony offered by the defense showing the estrangement of Kaplan from the members of his family, we find him at this very time, on July 18, 1915, executing a will wherein he gave to his wife all his household furniture and $2,000 in money. By said will the testator gave to Louis Kaplan, his sole surviving son, one-half of all of his property,

real and personal, in case the said son should survive him, and in case of his death, then the said half of all of his property was, by the terms of said will, to go to the children of his said son. By the said will, specific money bequests were made to the various grandchildren of testator and to several of his faithful employees and friends. Specific bequests were also made to a number of eleemosynary institutions, charities, schools, cemeteries and other Hebrew organizations. The son, Louis Kaplan, was also thereby made devisee of considerable specific real property of which the testator died seized. Nowhere in this will is the defendant or any of his family mentioned, and no reference is made to the notes held by the testator at the time of his decease, or of any desire or intention on testator's part to discharge the same. No claim is made but that at the time of the execution of this will the testator was in full possession of his mental faculties. The will has been admitted to probate and letters testamentary thereon issued to the son, Louis Kaplan, the sole executor therein named. The will and the probate proceedings were offered in evidence by the defendant. The execution of this will and its failure to mention the defendant or to refer to the notes in suit seem to me circumstances strongly contradictory of the alleged contract under which defendant seeks to avoid payment of the notes in suit. The fact that the testator retained possession of the notes until his death, even those which defendant claims had been renewed, seems to indicate that the testator, down to his death, regarded said notes as valid outstanding claims against the defendant. Unquestionably, the defendant, during the two years when testator was an intimate of his household, extended to him many attentions. That there was an ulterior purpose in this I am frank to believe. It is also quite clear that defendant was well paid in money for any attentions bestowed upon the testator.

Besides the testimony of the witness Nast, defendant seeks to sustain his position by the witness Max Hirsch. It seems to me that instead of furnishing corroboration to the testimony of Nast, the testimony of Hirsch is, in fact, contradictory thereof. Hirsch testified that he was present on the occasion in defendant's place of business shortly after July 4, 1913, to which Nast testified, and that he overheard

the conversation between the parties, although he did not participate therein himself. He at that time was endeavoring to purchase an interest in defendant's business, and later was successful in such effort and became the business partner of the defendant. The version of the witness Hirsch was that as a return for defendant's furnishing testator with a home and office room and the attentions specified, defendant said that he would take care of testator and do everything that he promised he would do; that testator could make his place his office; he could come home and make himself at home; he would try to do everything that he possibly could to make him contented, and if testator " felt at any time that he had fulfilled his treatment towards him, well, he could do as he pleased, he could call the payment off and call the payment of those notes off; and he told him at that time, he said, ' I hope that you will live a great many years and any time you feel that I have done my duty towards you, you can call the payment of these notes off.' "

This testimony falls far short of coming up to the required point of showing an absolute agreement on testator's part to release defendant from said notes. Taking Hirsch's testimony as true, in the absence of any act on testator's part exercising an option to " call the payment of these notes off," there is no evidence showing that defendant had been released therefrom. The alleged agreement testified to by Hirsch is, therefore, very different to that claimed by Nast.

A large amount of testimony is furnished, principally by defendant's wife, daughters, sister-in-law and intimates, with reference to the performance by defendant of the alleged agreement. All that these witnesses testify to and all the attention bestowed by defendant upon the testator are easily explained by the apparent effort which the defendant was making to ingratiate himself with his wealthy uncle and, if possible, to become the recipient of the latter's bounty upon his death. Evidently the defendant thought the field a fertile one, owing to the estrangement which he believed existed between the uncle and his family.

Considerable stress is laid by the defendant upon the fact that in connection with the action of testator's wife to obtain a decree of limited divorce, proceedings had been instituted

to compel the payment by the testator of alimony and counsel fees, and that, in opposing such application, the testator had made affidavit that he had no personal property, save some small bank deposits, and that on the matter being sent to a referee for examination and report, the old gentleman, being interrogated, had denied that the defendant owed him anything. While it would appear that testator made such denial, it was evidently for the purpose of avoiding the payment of alimony to his wife, and it is quite apparent that in giving such testimony he did not adhere to the truth, as, admittedly, at that time defendant was owing the testator several thousands of dollars secured by said notes which were then outstanding, and, under any aspect, were then undischarged.

Another circumstance of much weight, it seems to me, and which tends to disprove the making of the contract as testified to by the witness Nast, is the circumstance as shown by the testimony of defendant's bookkeeper Daum, that during the succeeding months after the alleged agreement was made defendant was a large borrower from the testator and received accommodations amounting to $12,000 during that period, $10,500 of which was repaid. If an agreement, as testified to by Nast, had been made, it certainly was broad enough to embrace these loans which were made to and repaid by the defendant during that period. Had the testator been as desirous as Nast would have us believe he was, to bestow upon his nephew the moneys which the latter owed him and to discharge the nephew from all obligation to pay such indebtedness, it would have been the simplest thing imaginable to have provided in his will for the discharge of said notes. The will is silent with reference thereto, and that circumstance furnishes the strongest proof that the testator had no such idea in his mind.

The law is so well settled in this State as to render unnecessary the citation of authorities, that a contract of the nature of that under which defendant seeks to avoid the payment of the notes in suit, must be established by the most satisfactory and convincing proof. The courts have uniformly held that such contracts, being easily fabricated and hard to disprove, must be scrutinized with great care, because of the fact that the sole contracting party on one side is dead and

unable to dispute the claim made. The courts have held that all such agreements should be in writing and the writing be produced, even though informal. In the absence of written proof of a clear and convincing character of the existence of such a contract, a claim upon the estate of a deceased person thereunder can only be allowed upon the production of evidence of a quality that leaves no reasonable doubt of the honesty of the claim made. In this case there was not a scrap of writing. The alleged contract is attempted to be proven by friends and business associates of the defendant, who claim to relate from memory the details of a conversation occurring years before when it is alleged the contract was made. I do not think the proofs offered were sufficient, under the decisions, to justify the submission of the question to the jury. The story related by the defendant's witness is so improbable and the circumstances are so inconsistent with its truth as to render it insufficient to establish any valid contract between the decedent and defendant. (*Rosseau* v. *Rouss*, 180 N. Y. 116; *Shakespeare* v. *Markham*, 72 id. 400; *Hamlin* v. *Stevens*, 177 id. 39; *Holt* v. *Tuite*, 188 id. 17; *Matter of McMillan*, 167 App. Div. 817.) I am further of the opinion that the alleged contract urged as a defense, having been made prior to the issuance of the renewal notes in suit, could not be received in evidence to affect the validity of said written instruments.

I, therefore, am convinced that the verdict of the jury was wrong, and that the judgment dismissing plaintiff's complaint should be reversed, and that a new trial should be ordered, with costs to the appellant to abide event.

CLARKE, P. J., LAUGHLIN, SMITH and SHEARN, JJ., concurred.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.