WILLIAM T. HOLT, as Administrator with the Will Annexed
of the Estate of MARGARET GALLAGHER, Deceased, Respond-
ent, v. THOMAS W. TUITE, Individually and as Adminis-
trator of the Estate of BRIDGET DITTON, Deceased, et al.,
Appellants.

DECEDENT'S ESTATE — ORAL CONTRACT OF DECEDENT TO GIVE ALL
OF HER PROPERTY TO CERTAIN PERSON — EVIDENCE — WHEN INSUFFI-
CIENT TO ESTABLISH CONTRACT.    In an action brought against the admin-
istrator of an estate to compel the specific performance of a contract
alleged to have been made between the decedent and the plaintiff, while
an infant, whereby the former agreed that upon her death all of her
property should pass to the latter in consideration, during the former's
life, of the companionship of the latter and the assumption of a child's
duties, and the performance of certain other services by the latter, which
contract was claimed to have been fully executed by the plaintiff, the
burden of proof rests upon the plaintiff to establish by the most convinc-
ing evidence that the contract was actually made; and where the only
evidence that there ever was any such contract — outside of the fact that
plaintiff, when five years of age, was taken from an infants' home or
asylum by decedent, with whom she lived as one of decedent's family
until her marriage — consists solely of the testimony of certain witnesses
of statements or admissions alleged to have been made by decedent rela-
tive to the alleged contract at various times, ranging from six to twenty-
five years before the trial, assuming that the witnesses were entirely
impartial and able to repeat with exact precision what decedent said, and
such evidence falls far short of establishing that at some time decedent
made with the child a specific contract whereby she bound up the dispo-
sition of all her property, present or future, for the consideration alleged,
a judgment in favor of plaintiff based solely upon the ground of an
express contract cannot be sustained.
    *Gallagher* v. *Tuite*, 110 App. Div. 915, reversed.

(Argued January 22, 1907; decided February 26, 1907.)

APPEAL from a final judgment entered May 21, 1906, upon
an order of the Appellate Division of the Supreme Court in
the second judicial department affirming an interlocutory
judgment in favor of plaintiff entered upon a decision of the
court on trial at Special Term.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*Charles L. Hubbell, David P. Hall* and *Philip Van Alstine* for appellants.   No contract whereby Margaret Gallagher became entitled to the estate of Bridget Ditton was proven. (*Hamlin* v. *Stevens*, 177 N. Y. 47; *Rosseau* v. *Rouss*, 180 N. Y. 116; *Southwick* v. *F. Nat. Bank*, 84 N. Y. 429; *Bradt* v. *Krank*, 164 N. Y. 579; *Ide* v. *Brown*, 178 N. Y. 26; *Gall* v. *Gall*, 64 Hun, 600; *Mahany* v. *Carr*, 175 N. Y. 454; *Ripson* v. *Hart*, 64 App. Div. 593; *Shakespeare* v. *Markham*, 72 N. Y. 400.)

*Sidney F. Rawson* and *J. Travis King* for Mary Hornby, appellant.   The decisions of the courts below cannot be sustained.   (*Brantingham* v. *Huff*, 174 N. Y. 53.)

*James Burke, Jr.*, for respondent.   The principles of law upon which this cause stands are well founded. (*Brantingham* v. *Huff*, 174 N. Y. 53; *Matter of Thorne*, 155 N. Y. 140; *Edson* v. *Parsons*, 155 N. Y. 555; *Stokes* v. *Stokes*, 155 N. Y. 590; *Winne* v. *Winne*, 166 N. Y. 263; *Godine* v. *Kidd*, 64 Hun, 585; *Van Duyne* v. *Vreeland*, 12 N. J. Eq. 149; *Shahan* v. *Swan*, 26 N. E. Rep. 222; *Gates* v. *Gates*, 34 App. Div. 608; *Gilman* v. *Hall*, 77 App. Div. 458; *Bouton* v. *Welch*, 48 App. Div. 378.)

HISCOCK, J.   This action was originally brought by Margaret Gallagher, and she having died, the present plaintiff was substituted in her place.   It was brought to compel specific performance of a contract alleged to have been made between the intestate, Bridget Ditton, and said Margaret Gallagher while an infant, whereby the former agreed that upon her death all of her property should pass to the latter in consideration during the former's life of the companionship of, and the assumption of a child's duties and the performance of certain other services by said Margaret, and which contract, it is claimed, was fully executed by the latter.

The complaint also alleged a legal adoption by the intestate of said infant, but this theory was abandoned or at least was

not sustained upon the trial, and judgment was awarded in favor of the plaintiff solely upon the theory of an express contract.

We find ourselves unable to concur in the disposition which thus far has been made of this case and think that within rules now well established by this court as applicable to actions of this character the judgment should be reversed.

Certain facts and incidents which in a general way are claimed to support plaintiff's contentions were established upon the trial without any particular criticism or doubt; and I shall cite these somewhat at length from the findings of the learned trial justice.

Margaret Gallagher, under the name of Margaret Harmon, and being then an infant about four years of age of unknown parents, sometime prior to July 22, 1872, was committed by the department of public charities of the city of New York to Randall's Island Asylums, Schools and Infants' Hospital. Upon the date mentioned and again one year later, being then five years old, she was discharged by the public authorities to Bridget Ditton, who was a married woman 35 or 40 years old having a living husband, and up to that time and thereafter childless. The child continued to live with Bridget and her husband until the death of the latter in 1891, and thereafter until her marriage, with Bridget alone. After her marriage she went elsewhere with her husband for a few years, but otherwise continued to live in a tenement house on the Ditton lot until the death of Bridget in 1900. Until she was married she was known as Maggie Ditton. She was confirmed under that name and as a prerequisite of such confirmation and rather at the suggestion of the priest than otherwise, was baptized in the same name. She was married from Bridget Ditton's house and her child was spoken of by the latter as a grandchild. The Dittons were in humble circumstances and engaged in the milk business, and Margaret, until her marriage, served them faithfully and laboriously, doing various kinds of work in connection with the milk business, and having poor clothes and various hardships, but leading a life no different

from that of those who had assumed her care. She had some schooling and when later for a period of four years she worked out she brought her wages home to Bridget.

After moving away with her husband she maintained friendly relations with Mrs. Ditton and was with her at and for some time prior to her death.

Passing beyond these general surroundings, there is no direct evidence of the alleged contract of which enforcement has been sought and allowed. It is not claimed that there was any written contract or that the public authorities or any other adult acted in behalf of the infant in making the alleged contract. Outside of the facts already referred to the evidence that there ever was any such contract consists solely in the testimony by certain witnesses of statements or admissions alleged to have been made by Bridget Ditton and which have been supposed to establish the existence and details of the contract.

I shall refer to this testimony somewhat at length, and again shall quote almost entirely the expressions of the learned trial justice, this time as found in his opinion. In reviewing and summarizing this testimony, he states as follows: " She (Mrs. Ditton) said to Lynch (one of the witnesses) ' This is the little girl I have taken out of the home; me and Tom are going to adopt her.' To Dempsey (another witness) she said: ' What work Margaret did, she did for herself; that when she died everything belonged to Margaret Ditton, her daughter. This happened a dozen times. That she had no child but Margaret Ditton and that when she died everything belonged to her; that is why she made her work.' She also told Lynch, ' After I am gone everything will belong to her and the harder she works the more she will have.' She told the witness Hart that Maggie was working for herself and not for her. Just before Mrs. Ditton was taken sick she had Margaret there and she wanted her to attend her and stay there; asked her forgiveness, that if she would forgive her she would die happy and that whatever was left was hers. Mrs. Ditton said that she had not used her right and had wronged

her.   Mrs. Mills (another witness) said she was present at a conversation between Mrs. Ditton and the mother of the witness, a neighbor.   My mother said to Mrs. Ditton, 'Why don't you make a will and leave Margaret what you are going to leave her?' and she said, 'When I die everything I have belongs to Margaret; she has worked hard, been faithful to me and kind to me."

It appears that the alleged declarations to the witness Dempsey were made from twenty-four to twenty-five years before the trial; those to the witness Lynch on several occasions "from ten to twelve or fourteen to fifteen years ago;" those to the witness Hart twelve or thirteen years before, and those to the witness Mills in part ten years or more, and in part six or seven years before the trial.   It further appears upon the subject of the disinterestedness of these witnesses that the defendant administrator in behalf of his intestate before the trial had foreclosed a mortgage on a house belonging to the mother of the witness Mills and the sheriff had ejected them; also that such mother had brought a suit against the estate for one thousand dollars, and in the case of the witness Hart that his wife and a Mrs. Lynch (it not appearing whether the wife of the witness Lynch) "got three thousand dollars away from Mrs. Ditton," and that there was a suit in reference to it between them and the defendant Tuite.

Certain other rather significant facts appear by plaintiff's evidence.   At the same time when Margaret lived with Mrs. Ditton another child by the name of Ella Reilly was an inmate of the home, and upon one occasion Mrs. Ditton asked the witness Lynch to give an estimate of the cost of building a fence dividing her lot and said, "One belongs to Ella and the other, this homestead, belongs to Margaret."   Shortly before her death Mrs. Ditton did execute to Margaret a deed of this homestead, which was claimed by the defendants to be worth upwards of $5,000, and which was found by the trial court to be worth not exceeding $2,000.

I next pass in order to a consideration of the rules by which

we are to determine the weight and force of the evidence and facts which have been recapitulated. Those rules must be reasonably familiar, for recently they have been formulated by this court after much consideration and with delibera· tion. They have emphasized with increasing decisiveness the caution with which claims of the class to which the present one belongs must be scrutinized and the high order of proof by which they must be sustained. The court has felt compelled to do this by the frequency with which such claims were arising and in view of the dangerous opportunities afforded through them of fraudulently sweeping the property of a dead person away from those to whom it would naturally pass. These rules must be general in their application and may not be too much shifted in any particular case to meet the necessities and equities, real or fancied, of that particular case.

In *Shakespeare* v. *Markham* (72 N. Y. 400, 403) it was said that such contracts " are properly regarded with grave suspicion by courts of justice and should be closely scrutinized, and only allowed to stand when established by the strongest evidence."

In *Hamlin* v. *Stevens* (177 N. Y. 39, 48) it was said: " While such contracts are sometimes enforced by the courts, it is only when they have been established · by evidence so strong and clear as to leave no doubt and when the results of enforcing them would not be inequitable or unjust."

In *Rosseau* v. *Rouss* (180 N. Y. 116, 120), in speaking of an alleged contract sustained by many equitable circumstances and directly testified to by one interested witness who was corroborated by three witnesses testifying to admissions made by the decedent to the effect that he had made a contract resembling the one sworn to, the court said : " Thus, the evidence relied upon to establish the contract is, *first*, the testimony of the mother, who tried to swear $100,000 into the pocket of her own child, and, *second*, the testimony of witnesses who swear to the admissions of a dead man. The former is dangerous; the latter is weak, and neither should

be acted upon without great caution.  We have repeatedly held that such a contract must not only be certain and defi. nite and founded upon an adequate consideration, but also that it must be established by the clearest and most convincing evidence  *  *  *.  We have been rigid and exacting as to the sufficiency of the evidence to establish them (such contracts) and have condemned the proof thereof 'through parol evidence given by interested witnesses,' as ' such contracts are easily fabricated and hard to disprove because the sole contracting party on one side is always dead when the question arises,' we have declared that they 'should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses.' "

When the evidence in this case is measured by the tests thus prescribed, I think that it not only does not square with them, but that it is unusually deficient.

While it may be conceded that such a contract as is claimed might have been equitable enough after the husband died and as against the present defendants  still there is no overwhelming balance in favor of Mrs. Gallagher's equitable claim to such a contract.  While she is entitled to credit for having been dutiful, she secured in the place of parents who had abandoned her, guardians who were apparently respectable and who fairly shared with her their means and support as well as their hardships.  She exchanged a charitable asylum for a home where she was at least free from the dangers incident to girlhood, and where she was absolutely welcome to stay as long as she desired, and in the end she secured property which formed a considerable portion of all of that which had been accumulated by Mrs. Ditton.

But, conceding that equitable considerations would have been satisfied by a disposition of all of the decedent's property, the burden still rested upon the plaintiff to establish that in fact a contract was made providing for such disposition. The mere fact that equity would justify such a contract will not satisfy the necessity of proving that such contract in fact

was made.   And it is on this point that plaintiff's case, as I regard it, is fatally weak.

I am uncertain just when the contract is supposed to have been made.   The complaint alleged that it was made by the public officials at the time the infant was delivered to Mrs. Ditton, but no such allegation was sustained upon the trial, and the findings are silent upon this point.   But necessarily, in order to make it valid, the contract must be assumed to have been made with the child at or soon after the time when she went to live with Mrs. Ditton and before she did the various things which are claimed to have been done upon the faith of it.   Contrary to the usual rule, no adult in behalf of the infant was a party to or vouched for the execution by her of the contract.   Thus we have an unilateral contract of the most pronounced character, whereby Mrs. Ditton absolutely relinquished any general right of disposition of her property even in favor of her husband, in consideration of a promise by a mere infant which could not be enforced.   No written instrument of the most informal kind evidenced what this contract was.   No outsider was present and no one purports to state in a comprehensive and definite way what the alleged agreement was.   Instead of this, we are relegated for proof to alleged statements made at dates ranging from six to twenty-five years before they were testified to, not carefully and deliberately on some occasion of importance, but without consideration in the course of informal and impromptu talks with neighbors and familiars.

Some of the witnesses who have detailed these talks do not appear in an entirely unprejudiced attitude ; but assuming that they are entirely impartial and that without any apparent cause for it they have been able after years to repeat with exact precision what the dead woman said, still I fail to find any sufficient proof of the alleged contract.   I find evidence upon the assumption indulged in which would justify the conclusion that the dead woman intended to adopt the girl, and that she desired or expected or believed that upon her death everything would belong to the child.   She may have

harbored the unfounded belief that the child was legally adopted and would inherit all of her property, but all of this is far away from plaintiff's theory and falls far short of establishing that at some time the woman made with the child a specific contract whereby she bound up the disposition of all of her property, present and future, to the latter in consideration of a promise to do the various things which the girl is said subsequently to have done.

The many cases cited by the learned counsel for the respondent to our attention for the purpose of leading us to a different conclusion have not been overlooked. It is not possible within reasonable limits to analyze and distinguish all of them, but a word may be said with reference to two in this court which seem to be relied upon. In *Winne* v. *Winne* (166 N. Y. 263) there was a written contract, and this having been lost, parol evidence of its contents was admitted which was regarded as satisfactorily establishing the lost instrument. In *Healy* v. *Healy* (166 N. Y. 624) this court was confronted by a unanimous decision in the Appellate Division which prohibited it from considering questions which in this case are open to us.

The judgment should be reversed and a new trial granted, with costs to abide event.

CULLEN, Ch. J., GRAY, EDWARD T. BARTLETT, HAIGHT and CHASE, JJ., concur; WILLARD BARTLETT, J., not sitting.

Judgment reversed, etc.