## MacGOWAN v. BARBER et al.

No. 225.

Circuit Court of Appeals, Second Circuit.

April 14, 1942.

Fenton, Wing & Morse, of Rutland, Vt., Collins M. Graves, of Bennington, Vt., and Jack Lewis Kraus, II, of New York City (Collins M. Graves, of Bennington, Vt., Jack Lewis Kraus, II, of New York City, John D. Carbine, of ·Rutland, Vt., and Harry B. Kurzrok and Arthur A. Lunin, both of New York City, of counsel), for plaintiff-appellee.

Lawrence & O'Brien, of Rutland, Vt., for defendants Norton Barber and Frank C. Hagyard, executors of the will of John W. Taylor; Bennington College; Warren City Hospital, City of Warren, Ohio; Young Women's Christian Association; William Earl Clark and Laura Tyler Goodrich, Norton Barber, pro se.

Edward H. Holden, of Bennington, Vt., for Vincent Ravi-Booth.

Leonard W. Morrison, of Bennington, Vt., for Town of Bennington.

Clark, Carr & Ellis, of New York City, and Waldo C. Holden, of Bennington, Vt. (George Adams Ellis and Paul A. Crouch, both of New York City, of counsel), for appellant First Congregational Church of Old Bennington.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff, the adopted daughter of John Warren Taylor, late of Bennington, Vermont, having been disinherited by his last will and testament and having unsuccessfully contested the probate of that instrument by which both real estate and personal property in Vermont and elsewhere were left to named beneficiaries, brought her bill in equity in the District Court for the District of Vermont against the executors and beneficiaries under the will to secure the benefit of a contract she alleged the testator had made with her when she was a child of eleven to leave her all his property at his death. She is a resident of New York and the defendants are all residents of other states. The defendants, Barber and Hagyard are the executors and Bennington College, Town of Bennington, First Congregational Church of Old Bennington, City of Warren, Ohio, Warren City Hospital; Young Women's Christian Association of Warren, William Earl Clark and Laura Tyler Goodrich are legatees or devisees or both who have appealed from a decree for the plaintiff.

Federal jurisdiction was put in the original bill both upon diversity and upon § 57 of the Judicial Code, 28 U.S.C.A. § 118. The prayer for relief included the impressing of a trust for the sole benefit of the plaintiff upon all the property of which Mr. Taylor died seized and possessed; the removal of the cloud upon the title thereto created by his will as allowed; and the transfer to the plaintiff of all of such property not required for the payment of debts and the expenses of administration.

Personal service within the District of Vermont was made upon all of the defendants except those about to be named. It was made in Ohio pursuant to an order of court upon defendants, City of Warren; Warren City Hospital; Young Women's Christian Association of Warren, Ohio; in California upon defendant Laura Tyler Goodrich; in Massachusetts upon defendant Frank C. Hagyard; and in Vermont upon his statutory agent; and in the District of Columbia upon defendant William Earl Clark. Defendants Brainard and Buell were not served at all and have not appeared. All the defendants who were served outside Vermont appeared specially and moved to quash the subpoena. This motion was denied and then the defendants without prejudice to their exceptions moved for a bill of particulars. This was in part granted and the order was complied with. Meanwhile defendants Barber and Bennington College moved to dismiss the bill on grounds not now material and after that motion had been denied and the defendants had answered, the plaintiff secured leave to, and did, amend her bill to confine it to the "real and personal property located and situated within the District of Vermont" of which Mr. Taylor died seized and possessed.

It is recognized by the appellants that if originally the suit was properly brought in rem under the provisions of § 57 of the Judicial Code, 28 U.S.C.A. § 118, service outside the district was valid. Nor do they deny that after the amendment limited the complaint to property within the district it was so brought. Nevertheless it is urged that service after the amendment was necessary upon those served outside the District since the service of the original bill upon them was invalid when made because the suit then was in personam in so far as property outside the district was concerned. General Investment Co. v. Lake Shore & M. S. Ry. Co., 260 U.S. 261, 280, 281, 43 S.Ct. 106, 67 L. Ed. 244; Wilhelm v. Consol. Oil Corp., 10 Cir., 84 F.2d 739, 747. And they point out

that the property actually outside the district cannot be treated as constructively within it because the decedent's will was probated there. Chase v. Wetzlar, 225 U. S. 79, 32 S.Ct. 659; 56 L.Ed. 990. From this it is argued that since the service outside the district was invalid when made it remained invalid after the amendment to the bill. The amendment, however, introduced no new cause of action but was merely to restrict the bill to but part of what had previously been its intended scope so as to bring it clearly within § 57 of the Judicial Code. Such a pleading related back to the commencement of the action even before Rule 15 Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, became effective. Underwood Contracting Corporation v. Davies, 5 Cir., 287 F. 776; Interstate Refineries, Inc., v. Barry, 8 Cir., 7 F.2d 548; Chesapeake & Ohio Ry. Co. v. Coffey, 4 Cir., 37 F.2d 320. That made the service good under § 57 as it would have been had the bill originally been drawn and served in its amended form. See, Porter v. Cooke, 5 Cir., 63 F. 2d 637.

The plaintiff alleged that she was born on May 3, 1897; that her parents had lived in Toledo, Ohio until they died, her mother shortly after the plaintiff's birth and her father on June 20, 1906; that John Warren Taylor who was living in Cleveland, Ohio, was duly appointed her guardian on July 2, 1906, and that upon his application to the Probate Court for the County of Cuyahoga, in the State of Ohio, proceedings were had in accordance with the laws of Ohio which resulted in his adoption of the plaintiff on November 30, 1908, as his legal child and heir and that this adoption continued to be in full force and effect at the death of Mr. Taylor on February 20, 1934.

She also alleged in the following language the making of the contract she was seeking to enforce. "And the plaintiff avers that prior to said adoption proceedings hereinbefore described the said John Warren Taylor entered into a certain contract with the plaintiff whereby and under the terms thereof the said John Warren Taylor faithfully promised and agreed with the said plaintiff that if the said plaintiff would permit said adoption, and would thereafter be known and called by the name of Mary Boone Taylor, and become the lawful child by adoption of the said John Warren Taylor, who was then her guardian duly appointed as aforesaid, and executor and trustee under the will of her said father, George B. Boone, and who was then unmarried and without issue of his own, that he, the said John Warren Taylor would make and execute a valid and effective last will and testament whereby and wherein he would leave at his death to the said plaintiff all of the property real, personal and mixed, wheresoever located or situated, which he should own, and of which he should then be possessed at the time of his decease. In consideration whereof and in compliance thereto the said plaintiff did then and there become adopted according to the provisions of the law of Ohio, and did then and there assume and take the name of Mary Boone Taylor, and did thereafter and until the times hereinafter set forth live with and as a member of the family of the said John Warren Taylor as his lawful daughter, and in all things conducted herself in every way and manner as a faithful, loyal child of the said John Warren Taylor, and not otherwise." And, after alleging her ratification of the contract after she became of age and the breach of it by Mr. Taylor by disinheriting her completely, the plaintiff prayed for the relief already mentioned.

The trial judge filed what is called a "Decision of the Facts" on November 17, 1938. No promise to make a will as alleged was proved or found but there were findings in accord with the allegations as to the guardianship and to the effect that Mr. Taylor had adopted the plaintiff after she had consented to the adoption upon his promise to her "that if she would consent he would adopt her and make her his heir." No decree was entered however and the matter seems to have been held in abeyance until the trial judge, who had meanwhile retired, filed what is called a "Decision of More Facts and Opinion" on August 30, 1941. The additional findings were not supported by any additional evidence. They show that the judge was then satisfied beyond a reasonable doubt that Mr. Taylor had agreed that if the plaintiff would let him "adopt her she should inherit his property" and that she "performed her part of the contract, but in his wrath he breached his part by disinheriting her by his last will and testament."

The judge held that the adoption proceedings were part performance of the contract sufficient to satisfy "the Ohio statute of frauds" and that as "the damages for the breach of this contract cannot well or accurately be determined, this gives

her [the plaintiff] the right to specific performance and consequently the right and title to all his property, whatever is left after paying for his funeral, for the services and expenses of his executors and his debts, as shall be decided by the Probate Court." The final decree from which this appeal was taken so provided as to "all Taylor's property located in this District, including all his choses in action, and the evidence thereof, wherever their situs."

The findings respecting the making of the alleged contract are based on the recollection of witnesses as to what they heard Mr. Taylor say in that regard from some twelve up to thirty years before they testified. There were only three whose testimony did more than show that Mr. Taylor had said he intended to leave his property to the plaintiff and their testimony will be considered later. There was no memorandum in writing either of an agreement to make a will as alleged or to let the plaintiff inherit all decedent's property as found.

■ Though findings of fact by a trial judge are entitled to be given great weight on appeal from a decree in equity, such appeals involve a review of the facts as well as of the law. Virginian Railway Co. v. United States, 272 U.S. 658, 675, 47 S.Ct. 222, 71 L.Ed. 463; La Abra Silver Mining Co. v. United States, 175 U.S. 423, 464, 465, 20 S.Ct. 168, 44 L.Ed. 223; Standard Accident Insurance Co. v. Simpson, 4 Cir., 64 F.2d 583, certiorari denied sub nom. Carolina Contracting Co. v. Standard Accident Insurance Co., 290 U.S. 688, 54 S.Ct. 123, 78 L.Ed. 593. It is especially important that an appellate court be satisfied that the facts found are the facts proved in a case of this kind where the memory of witnesses as to what a testator said many years before has been held enough to remove from the operation of his duly allowed last will and testament all of the property he owned at the time of his decease. Compare, Holt v. Tuite, 188 N.Y. 17, 80 N.E. 364; Hamlin v. Stevens, 177 N.Y. 39, 69 N.E. 118; Ennis v. Chichester, 187 App.Div. 53, 175 N.Y.S. 244.

Some significant facts upon which the record shows that all concerned agree are that Mr. Taylor was an unmarried man well past middle age living in Cleveland, Ohio, when the plaintiff's father died. The two men had been intimate friends and the deceased had named Taylor in his will as the trustee of a testamentary trust created for the plaintiff. He also desired to have Mr. Taylor appointed the plaintiff's guardian. That was done and the plaintiff went to live in Taylor's home soon after her father died. He treated her as though she were his own child and their affection and regard for each other became like that of natural father and child. In about two years he had adopted her and they continued to live happily in the relationship of father and daughter until sometime after she married her first husband. Mr. Taylor liked the husband and approved the marriage. He later persuaded the couple, who were living in New York City where the plaintiff's husband had a position he was reluctant to give up, to move to Toledo, Ohio, where Mr. Taylor had an office in which the husband went to work on a somewhat increased salary. It was understood that he was to learn the real estate business to enable him properly to manage the property Taylor would leave the plaintiff when he died. While working in Taylor's office the husband found what he considered, and persuaded the plaintiff, were improper loans of the funds of the Boone trust made by Taylor as trustee to a corporation he controlled. Litigation resulted which apparently showed that though such loans had been made they had been at least financially sound. Mr. Taylor's feelings toward the plaintiff were changed by this trouble and during the remainder of his life—about twelve years— he would have nothing whatever to do with her. She was divorced from her first husband and married again but apparently that did not affect Mr. Taylor's feelings toward her. He made wills before the trouble in which he left substantially all of his property to her but after the estrangement he made wills and codicils showing in no uncertain terms his determination that she was to inherit nothing whatever from him.

At the trial, the plaintiff introduced no evidence to the effect that the testator had promised to will her all, or any, of his property. Her theory of her case then apparently was, and now is, that he promised her that when he died she would inherit all the property he left if she would consent to be adopted by him; took his name; conducted herself as his dutiful daughter; and that she promised and performed in reliance upon the promise which he failed to keep.

The witness whose testimony more than that of any other tends to support the agreement found was a Miss Bell who had known the plaintiff since about the time Mr. Taylor adopted her. The two ladies were, and for many years had been, intimate and at the time of the trial the plaintiff was living with Miss Bell who was somewhat older and whose first remembrance of her was as a grown person would remember a child. Mr. Taylor had, after the adoption, married Miss Bell's widowed aunt and for about two years he and the plaintiff had lived in the home of the aunt with whom Miss Bell then, as well as before and afterwards, made her home. Mr. Taylor was later divorced but that did not interrupt the friendship of Miss Bell and the plaintiff.

Miss Bell testified both in person at the trial and by deposition which was introduced in evidence. She remembered that when the plaintiff was just a small girl, "around ten I would say" Mr. Taylor brought her to the home of the witness's aunt in Cleveland to call one afternoon when the witness was living there with her aunt and her aunt's first husband. She testified at the trial that Mr. Taylor told them during the call which lasted from one-half to three-quarters of an hour that he had adopted the little girl and "during the conversation he said that the agreement had been made with her that if she permitted him to adopt her he would leave his entire property to her." She was able to remember such a statement of so long before, more than thirty years, because it "made such an impression upon us * * * because of the age of the child—being such a small child." She also testified that while Mr. Taylor and the plaintiff were living in her aunt's home he often brought up the subject and when asked to tell what he said about it she replied, "Well, it was always along the same lines, that he was to leave all his property to Frances when he died." "Q. And did he refer to the matter of the agreement on any of these occasions? A. Well, it was always of that nature; that it was an agreement that he had made with her." In her deposition which she had given before the trial she had testified that she couldn't presume to quote what Mr. Taylor said but the substance of it was that "if she would permit him to adopt her, he had agreed to make her his sole heir."

There were but two other witnesses who testified in person on this subject at the trial. One was Mary L. White, a schoolmate of the plaintiff, who had visited her in her home with Mr. Taylor before she was married and who testified that "quite often he would remark that all his property would eventually belong to Mary Frances; that she was his only heir." She did not testify that he ever said he made any agreement or contract to leave the plaintiff anything. The other was E. Harrison Frawley, the plaintiff's first, and divorced, husband. He testified that in Cleveland on the day he and the plaintiff were married Mr. Taylor "* * * gave me a resumé of Frances from the time she was born, and revealed to me for the first time there was an estate. * * *; then he told me about the time her father had died—where he was appointed trustee and guardian, and he also mentioned about some poor relatives that tried to snatch Frances away because they figured there was considerable money in her father's estate; so he told me he had to go after her, and to satisfy these relatives, he entered a contract to adopt her and make her his sole heir. * * *." What the contract was or whether it was made with the little girl or with her relatives did not otherwise appear in his testimony. The other evidence of statements by Mr. Taylor on the subject is found in depositions introduced in evidence. We are in as good a position to determine the credibility of those witnesses as was the trial judge.

One of them was a Mrs. Gardner who was the widow of the son of Miss Bell's aunt who had married Mr. Taylor. She was living in Cleveland at the time her deposition was taken in 1938 and had lived there since 1906. She remembered being with the family on the porch of her mother-in-law's home one afternoon when Mr. Taylor came to call with a little girl and when asked what he said about the little girl replied, "Well he told us about her, being a friend of her father, that he thought she was such a sweet little girl and that he adopted her. * * * Q. And did he say at that time anything with respect to what he intended to do for her? A. Oh, yes. He said, 'I have adopted this little girl and I am—I have agreed to make her my heir.' He said, 'I have nobody else.'" She also testified that he continued to call occasionally with the little girl and that after he married her mother-in-law

she saw more or less of him and the plaintiff. They acted like a father and daughter and when asked if he referred from time to time " * * * to the facts respecting the original conversation that you have testified about, that is, his intention and his agreement to make Mary Frances his heir," she replied, "Yes; he brought it in whenever he could. It seemed to me he almost dragged it in sometimes." The last time she heard Mr. Taylor speak on the subject was in 1926 or 1927 after the estrangement when she met him at a dinner in Cleveland and he inquired about Frances among others. She told him Frances was well but was "having quite a bit of financial difficulty—and he seemed very sorry. * * * He said, 'You know, I have always promised her that she should have my estate and I think this will do her good.' And I couldn't resist the temptation. I said, 'Oh, Mr. Taylor, why don't you help Frances a little bit now? The estate is big enough so that you won't miss it.' He said, 'Oh, well,' he said, 'I keep my agreements; I keep my promises. She shall have it when I am gone but'; he said, 'right at the moment,' he said, 'I think this will be a good test.' What more could I say?"

Jason A. Barber, who was the executor of the will of the plaintiff's father, testified by deposition that he had differences with Mr. Taylor over the amount of the bill the witness rendered for extraordinary services as executor and that Mr. Taylor said "that he did not intend to make any charge whatever, and he thought that I ought not to." The witness was asked, "Did he give any reason as to why he wasn't going to make any charge or as to what his intention was in that respect?" He replied, "All that I can recall, one of his arguments was that it didn't make any difference whether he made any charge or not. Frances was going to get whatever he had, all the property he left."

The only other witness who testified by deposition on the subject was Kathleen Anderson Manton another former schoolmate of the plaintiff. She had known the plaintiff well since 1912; had visited in her home a number of times, both before and after plaintiff's first marriage; and had heard Mr. Taylor talk about her. She testified when asked if she had heard him "make statements that indicated that he intended to turn over his property to her upon his death?", "Well, perhaps not in so many words, but that was my understanding from remarks that were made." She said she had heard Mr. Taylor say that in substance. She didn't see him after the trouble he had with the plaintiff over the trusteeship.

The foregoing discloses the sum and substance of the testimony as to what Mr. Taylor said about leaving his property to the plaintiff according to an agreement or otherwise which under the surrounding circumstances as shown convinced the trial judge beyond a reasonable doubt that he had made a contract with the plaintiff under which he bound himself to leave her all his property at his death.

The circumstances are clear enough and may be stated more briefly. The contract, if made at all, was with an eleven year old girl who had for nearly two years been living in the Taylor home as though she were a daughter of whom he was very proud. There is not the slightest intimation in the record that when he wanted to adopt her she made the least objection. On the contrary, all the evidence as to their relations shows that her attitude toward him was that of a loving child whose affection he had well earned. It would be unreasonable to believe that her wishes about the adoption didn't coincide with his own. And unreasonable too would it be to think that, even if some bargain had to be made with her to make her acquiescent, one to leave her his property at his death would have made much of an impression upon so little a girl. Moreover, her consent to the adoption at the age of eleven was entirely unnecessary to its consummation under Ohio law. Revised Statutes of Ohio, §§ 3137, 3139, 3140. That he should, under circumstances making it so clear that there was no need to do so, make such a contract as the trial judge has found he made which deprived him of the right to provide by will for any wife he might marry; or for any natural child he might have; or to give effect to any change in his feelings toward the plaintiff which the future might bring taxes credulity so strongly that unequivocal and disinterested evidence is needed to support the findings on which the decree was entered. We fail to find such evidence in this record.

The witnesses who testified as to any admissions of any agreement might well have remembered what were mere expressions of Mr. Taylor's intentions sometimes to make the plaintiff his sole heir

and sometimes to leave her all his property as admissions by him that he had made an agreement to do so. When they were permitted to give their version of the substance of what he said they used the words "agreement" or "contract" to be sure but what they obviously meant, and could only mean, was that as they then remembered the gist of what Mr. Taylor had said they thought he had admitted what in their opinion amounted to the making of an agreement or contract with the plaintiff to leave her all his property at his death. Frawley did not even make it clear whether he understood the decedent to say that he made the agreement with the plaintiff or with her poor relatives. The witnesses who recalled merely statements by Taylor that the plaintiff would inherit all his property, testified only to his intentions in that regard as so disclosed.

There can be no doubt of Mr. Taylor's intent, often expressed, to leave his entire estate to the plaintiff until she and her first husband accused him of dereliction in his duty as trustee. In the litigation which followed he was asked if he didn't adopt the plaintiff with the idea of assuming the situation of a parent and he replied, "Not exactly; no sir; my sole object of adopting that girl was that she should be my heir. I had no other heir and I wanted her to be my heir in case anything happened that a will would not stand. She spoke to me several times about it. She said she wanted to belong to somebody and she got the idea, some way, that if I adopted her she would belong to me. She and I were very congenial until she met this man here." (Meaning Frawley.)

The testimony to the effect that Mr. Taylor admitted that he made any contract with the plaintiff, and that was the only agreement the trial judge found, does not measure up to the required standard previously stated. It is but the opinion evidence of lay witnesses as to the legal effect of words spoken by the decedent. No one pretended to be able to repeat his exact words. And where the memory of witnesses is so faulty, because of the lapse of time or for other reasons, that the language a speaker has used cannot be repeated, the conclusion of the witness as to whether there was an admission of the making of an "agreement" or "contract"—a conclusion both of fact and law—should be accepted with great caution. Such testimony should be given little weight when the circumstances under which the statements were made disclose so clearly as they do here the inherent unlikelihood that any such agreement or contract as the witnesses concluded the decedent admitted making was ever made at all.

If Mr. Taylor's expressions of an intent to leave the plaintiff all his property could be treated as promises to do so they would be wholly gratuitous. This girl before adoption was in no position to give such consideration as was needed to make such promises binding as a contract. She could only consent to be adopted; to take the name of Taylor; and to be his dutiful daughter. The first two consents were not required under Ohio law and the third was not a matter of consent but of duty owed upon adoption. The fact that she was glad to be adopted; to take his name; and behave as his daughter as a little girl in her situation might be expected to do adds nothing to the otherwise lacking proof of consideration for any unexecuted promise made by him. And after the adoption their legal relationship was that of father and child with corresponding duties owed each other as of right. Nor can love and affection be treated as sufficient consideration for an unexecuted promise. Brainard v. Commissioner, 7 Cir., 91 F.2d 880, 882.

Since the decree is erroneous for the reasons given, we do not need to discuss the effect of the Statute of Frauds, either of Ohio or of Vermont, upon the parol contract found or its enforceability.

Decree reversed and bill dismissed.